(Nos. 45419, 45420 cons.—■■■■■■■■

THE PEOPLE *ex rel.* LAWRENCE E. KLINGER, Appellant, v. MICHAEL J. HOWLETT, Auditor of Public Accounts, Appellee.

*Opinion filed October 1, 1973.*

KLUCZYNSKI and WARD, JJ., dissenting.

Don H. Reuben, Lawrence Gunnels, James C. Munson, and James A. Serritella, all of Chicago (Kirkland & Ellis, of counsel), for appellant.

William J. Harte and Kevin M. Forde, Special Assistant Attorneys General, of Chicago, for appellee.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

These appeals involve the constitutionality of three legislative programs intended to provide financial assistance for nonpublic elementary and secondary education. Each program is embodied in two statutes: one establishes it, the other makes the initial appropriation. Prior to July 1, 1972, the effective date of the statutes, the Auditor of Public Accounts instructed his staff that "because of serious doubts that exist concerning the constitutionality of these six statutes under the United States and Illinois constitutions," they were not to process vouchers or issue warrants under them.

Lawrence E. Klinger sought leave to file an original *mandamus* action in this court to compel the Auditor to implement these programs. (No. 45250.) The court denied leave to file the original action and suggested that an action be brought in the circuit court so that evidence could be heard. The suggestion was followed; an action was filed, evidence was heard, and the trial judge held that two of the programs were constitutional and issued the writ of *mandamus* with respect to them. He found the third program to be unconstitutional. Each party appealed from the adverse portion of the judgment, and the appeals were consolidated. After the case had been argued in this court it was held, awaiting the decision of the Supreme Court of the United States in cases that presented similar issues. Those cases were decided on June 25, 1973.

In so far as the validity of these statutes under the constitution of Illinois is concerned, our decision in this case is controlled by *Board of Education v. Bakalis* (1973), 54 Ill.2d 448, which held that section 3 of article X of the Illinois constitution of 1970 imposes restrictions concerning the establishment of religion that are identical to those imposed by the first amendment to the constitution of the

United States. Thus, any statute which is valid under the first amendment is also valid under the constitution of Illinois. The effect of the decisions of the Supreme Court of the United States under the Establishment Clause was recently thus described: "Taken together these decisions dictate that to pass muster under the Establishment Clause the law in question, first, must reflect a clearly secular legislative purpose, *e.g., Epperson v. Arkansas,* 393 U.S. 97 (1968), second, must have a primary effect that neither advances nor inhibits religion, *e.g., McGowan v. Maryland, supra* [366 U.S. 420 (1961)] ; *School District of Abington Township v. Schempp,* 374 U.S. 203 (1963), and, third, must avoid excessive government entanglement with religion, *e.g., Walz v. Tax Comm'n, supra* [397 U.S. 664 (1970)]. See *Lemon v. Kurtzman, supra* [403 U.S. 602 (1971)], at 612-613; *Tilton v. Richardson,* 403 U.S. 672, 678 (1971)." (*Committee for Public Education and Religious Liberty v. Nyquist* (1973), 413 U.S. 756, 772-773, 37 L. Ed. 2d 948, 962-963, 93 S. Ct. 2955, 2965.) These, then, are the standards against which the statutes before us are to be measured.

We consider first Public Act 77—1890, the title òf which is: "An Act to promote the education of the children of this State, who attend nonpublic schools and who are members of low income families, by providing for State grants to parents to help them pay for their children's education, thereby to serve a public purpose ***." The short title of this Act is the Nonpublic State Parental Grant Plan for Children of Low Income Families Act. The Act included legislative findings that:

"(4) [Certain 'severe and continuing social problems'] are due in large part to the failure of the public elementary and secondary schools in economically depressed areas of low income population to adequately educate Illinois youth and to prepare them to assume economically and socially responsible positions in their communities;

* * *

(10) nonpublic schools, by providing instruction to children coming from economically depressed areas of our State, make an important contribution to the alleviation of this crisis facing our citizenry;

* * *

(12) *** nonpublic schools also relieve the State of a significant financial burden which if left unchecked, would result in an intolerable financial and educational burden to the State;

* * *

(14) *** there has been a continuing decline in the enrollment in nonpublic schools in low income population areas that seriously threatens the continued existence of numerous nonpublic schools in such low income population areas;

* * *

(17) [if continued decreases in enrollments force the closing of a significant proportion of nonpublic schools in low income population areas,] the consequence of this sudden influx of masses of new students into the public schools, already grossly overburdened, understaffed, and overcrowded, would be a totally chaotic and unacceptable condition in the public schools in low income population areas resulting in those schools being completely unable to perform their vitally important function of educating the students enrolled therein;

* * *

(19) the State has the right and duty, in order to promote the future well-being of all its citizens and particularly those who are economically and socially disadvantaged, to provide State grants to low income parents to help them pay for the education of their children in nonpublic schools; such grants serve a public purpose." P.A. 77—1890, sec. 2; Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1002.

Sections 4 and 8 of Public Act 77—1890 provide:

"Under this Act, the parent of any child attending a nonpublic school is entitled, as partial payment for the expenses incurred in providing schooling, to a yearly per child State grant. This per child State grant shall be equal to the actual per pupil amount contributed by the State, as provided for in Sections 18—8 to 18—10 of 'The School Code', to the public school district within which

the particular nonpublic school child resides. State grant payments, provided for in this Act, shall be made semi-annually.

This Act is limited to parents whose family income is less than $3,000 per year, or whose annual family income is in excess of $3,000 per year from payments under the program of aid to families with dependent children under the Illinois plan approved under Title IV of the Social Security Act." P.A. 17—1890, sec. 4; Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1004.

"*** Each certified amount shall be made payable jointly to the applying parent and the nonpublic school to which the particular parental application pertains." P.A. 77—1890, sec. 8; Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1008.

A companion bill (P.A. 77—1893) appropriated $4.5 million to make these payments.

In *Committee for Public Education and Religious Liberty v. Nyquist* (1973), 413 U.S. 756, 37 L. Ed. 2d 948, 93 S. Ct. 2955, the Supreme Court held invalid a New York tuition-grant program for low-income families which cannot be distinguished from that provided in Public Act 77—1890. Concerning that program the court said: "There has been no endeavor 'to guarantee the separation between secular and religious educational functions and to ensure that State financial aid supports only the former.' *Lemon v, Kurtzman, supra,* at 613. Indeed, it is precisely the function of New York's law to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure that they continue to have the option to send their children to religion-oriented schools. And while the other purposes for that aid—to perpetuate a pluralistic educational environment and to protect the fiscal integrity of over-burdened public schools—are certainly unexceptional, the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions.'" (413 U.S. 756, 783, 37 L. Ed. 2d 948, 968-969,

93 S. Ct. 2955, 2970-71.) Public Act 77—1890 is subject to the constitutional objections that invalidated the New York statute, and it is also invalid.

The second of the programs is contained in Public Act 77—1891. The title of this Act is: "An Act to promote the education of the children of this State who attend nonpublic schools by providing for State grants to parents to help them pay for their children's education, thereby to serve a public purpose ***." The short title is the Nonpublic State Parental Grant Act. The Act contains legislative findings that:

"(2) nonpublic education in the State of Illinois today, as during past recent decades, bears the burden of educating a large percentage of all elementary and secondary school pupils in the State of Illinois; that the requirements of the compulsory school attendance laws of the State of Illinois are fulfilled through nonpublic education;

\* \* \*

(5) government support of nonpublic education contributes to the pluralism of American society by enabling parents more readily to determine the kind of education that their children shall receive;

\* \* \*

(7) if a majority of parents of the present non-public school population decide to remove their children to the public schools of Illinois, an intolerable financial burden to the public would result as well as school stoppages and long term derangement and impairment of education in Illinois;

(8) this hazard to the education of children may be substantially reduced and all education in Illinois may be improved through the providing, as specified herein, of certain State textbook grants and auxiliary services to parents of children attending Illinois nonpublic schools;

(9) the State has the right, in the fulfillment of its education duties, to provide State textbook grants and auxiliary services to parents to help them pay for the secular education of their children in nonpublic schools; and

(10) such grants serve a public purpose." P.A. 77—1891, sec. 2; Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1022.

Public Act 77—1894 appropriated $20,500,000 for textbooks and auxiliary services.

Despite the breadth of its title and its recitals of legislative findings and policy, Public Act 77—1891 is actually concerned only with the furnishing of textbooks and "auxiliary services" to nonpublic school students. We consider separately each of these subjects.

With respect to textbooks, the Act provides for requests by parents of children attending nonpublic schools for specific textbooks selected from a list maintained by the Superintendent of Public Instruction. The request is made to the school district in which the nonpublic school is situated. (Sec. 5.) If the district loans textbooks free to its public school students then it shall loan them free to nonpublic school students whose parents request them. If the district rents them to its public school students, it must rent them on the same terms to nonpublic school students. If the district sells textbooks to its public school students, "then that school district shall not be required to furnish textbooks to nonpublic school children." (Sec. 6.) Section 8 provides:

> "In the event that a public school district rents its textbooks to nonpublic school students, the amount received in rent by the public school district for such textbooks shall be forwarded to the Superintendent of Public Instruction at such times and in such manner as the Superintendent shall prescribe. It is the duty of each school district to pursue diligently the collection of textbooks rents and to make an annual accounting, as shall be prescribed by the Superintendent, to the Superintendent of rents charged and collected."

Although the title of the Act refers to grants to parents, the petitioner has taken the position that the grants which it authorizes run to the public school district and not to the parents of the nonpublic school child. We need not determine the soundness of this construction of the statute, for whether the money goes to the parent or to the school district that advanced the cost of the

textbooks, the result is to create a State subsidy for textbooks furnished to children who attend nonpublic schools which is not available for textbooks furnished to students who attend public schools. The cost of textbooks for public school students is paid for by the taxpayers of the local school district. The cost of textbooks for nonpublic school students is paid for by the State. The Supreme Court stated the principle that controls this kind of legislation in *Sloan v. Lemon* (1973), 413 U.S. 825, 832, 37 L. Ed. 2d 939, 945, 93 S. Ct. 2982, 2986-2987:

> "The State has singled out a class of its citizens for a special economic benefit. Whether that benefit be viewed as a simple tuition subsidy, as an incentive to parents to send their children to sectarian schools, or as a reward for having done so, at bottom its intended consequence is to preserve and support religion-oriented institutions. We think it plain that this is quite unlike the sort of 'indirect' and 'incidental' benefits that flowed to sectarian schools from programs aiding *all* parents by supplying bus transportation and secular textbooks for their children. Such benefits were carefully restricted to the purely secular side of church-affiliated institutions and provided no special aid for those who had chosen to support religious schools. Yet such aid approached the 'verge' of the constitutionally impermissible. *Everson v. Board of Education,* 330 U.S. 1, 16 (1947)."

In this case the difficulty appears to result from the theory of the statute which recites in section 4 that: "Under this Act, the parent or any child attending a nonpublic school is entitled, as partial payment for the expenses incurred in providing schooling for his or her child or children, to a per child State textbook grant, as hereinafter provided." (Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1024.) This sentence expresses an erroneous

philosophy akin to that stated in finding (19) of section 2 of Public Act 77—1890, that "the State has the right *and duty* \*\*\* to provide State grants to low income parents to help them pay for the education of their children in nonpublic schools." (Emphasis supplied.) (Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1002.) Whatever ambiguities may exist in the decisions under the first amendment, nothing in those decisions suggests that a State has a "duty" to provide grants for parents to help them pay for the education of their children in nonpublic schools, or that any parents are "entitled" to reimbursement, partial or complete, for the expenses incurred in providing nonpublic schooling for their children.

With respect to auxiliary services, the plan of the statute is similar. Applications by the parents of nonpublic school students are required. Here it is clear, however, that in all instances the amount of the grant allocated to the parent of a nonpublic school child is actually to be paid to the school district rather than to the parent. (Secs. 14, 15.) The school district is reimbursed from State funds for auxiliary services rendered to students in nonpublic schools, but not for those rendered to students in public schools.

As we view the statute, the auxiliary services which it authorizes fall into two categories. The first, "School Health Services," is described as including "school physician and surgeon services, school nurse services, school dental services, school podiatrist services." These services, in our opinion, are either purely secular or they can be determined to be secular without such policing as would amount to "excessive entanglement." (*Cf. Everson v. Board of Education* (1947), 330 U.S. 1, 91 L. Ed. 711, 67 S. Ct. 504; *Board of Education v. Allen* (1968), 392 U.S. 236, 20 L. Ed. 2d 1060, 88 S. Ct. 1923.) As stated in *Lemon v. Kurtzman,* "Bus transportation, school lunches, public health services, and secular textbooks supplied in common to all students were not thought to offend the

Establishment Clause." 403 U.S. 602, 616-17, 29 L. Ed. 2d 745, 758, 91 S. Ct. 2105.

This portion of the statute, however, is subject to the same difficulty that has been mentioned. It does not treat all students alike. The dental examinations and dental services furnished to nonpublic school students, for example, are paid for by the State; those furnished to public school students are paid for by local taxpayers.

The other categories of auxiliary services are of a different kind. They are: "(2) School Guidance and Counseling Services; (3) School Psychologist Services; and (4) Remedial and therapeutic programs for educationally disadvantaged children (such as, but not limited to, remedial reading skills and teaching English as a second language)." (Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1031.) The record shows that it is the function of a counselor to provide a student information on "all types of problems" that he has, and "all types of programs" available to him: "It could be social, emotional, educational, vocational, such as this. Also to have, on a one-to-one basis, interpersonal relationships to assist them in resolving decisions they must make." It seems clear that the kind of function involved in providing counselling and psychological services, as well as in "remedial and therapeutic programs for educationally disadvantaged children," is not susceptible of supervision to assure a strictly secular content. As was stated in *Levitt v. Committee for Public Education and Religious Liberty* (1973), 413 U.S. 472, 480, 37 L. Ed. 2d 736, 743, 93 S. Ct. 2814, 2819, "*** the potential for conflict 'inheres in the situation,' and because of that the State is constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination. Seē *id.* [*Lemon v. Kurtzman,* 403 U.S.], at 617, 619. Since the State has failed to do so here, we are left with no choice under *Nyquist* but to hold that Chapter 138 constitutes an impermissible aid to religion; this is so because the aid that will be devoted

to secular functions is not identifiable and separable from aid to sectarian activities."

The third of the legislative programs, Public Act 77—1895 (Ill. Rev. Stat., 1972 Supp., ch. 122, pars. 1051-1068), is called the Illinois Educational Development Board Act. It provides for an "Illinois Educational Development Board" and an "Illinois Educational Development Fund." The board is to "stimulate and encourage the establishment or expansion of exemplary and innovative elementary and secondary school educational programs through the providing of grants therefor." (Sec. 9.) An innovative program includes:

"(a) remedial instruction, and school health, physical education, recreation, psychological, social work, and other services designed to enable and encourage persons to enter, remain in, or reenter educational programs, including the provision of special educational programs and study areas during periods when schools are not regularly in session;

(b) comprehensive academic services and, where appropriate, vocational guidance and counseling;

(c) specialized instruction and equipment for students interested in studying advanced scientific subjects, foreign languages, and other academic subjects which are not taught in the local schools or which can be provided more effectively on a centralized basis;

(d) making available modern educational equipment and specially qualified personnel, including artists and musicians, on a temporary basis for the benefit of children in public and nonpublic schools;

(e) developing, producing, and transmitting radio and television programs for classroom and other educational use;

(f) providing special educational and related services for persons who are in or from rural areas or who are or have been otherwise isolated from normal educational opportunities, including, where appropriate, the provision of mobile educational services and equipment, special home study courses, radio, television, and related forms of instruction, bilingual education methods and visiting teachers' programs;

(g) encouraging community involvement in educational programs;

(h) providing programs for gifted and talented children;

(i) programs for testing students in the public and private elementary and secondary schools, and programs designed to improve guidance and counseling services at the appropriate levels in such schools;

(j) programs to improve the quality of teacher preparation, including student-teaching arrangements, in cooperation with institutions of higher education and local educational agencies;

(k) programs and other activities specifically designed to encourage the full and adequate utilization and acceptance of auxiliary personnel (such as teacher aides) in elementary and secondary schools on a permanent basis; and

(*l*) providing local educational agencies and the schools of those agencies with consultative and technical assistance and services relating to academic subjects and to particular aspects of education such as the education of the handicapped, and gifted and talented children, school building design and utilization, school social work, the utilization of modern instructional materials and equipment, transportation, educational administrative procedures, and school health, physicial education and recreation." Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1059.

Section 10 of the Act requires that an application for a grant shall:

"(a) be jointly submitted and sponsored by any combination of public or public and nonpublic

1. school personnel;

2. schools; or

3. other educational agencies and bodies within this State.

(b) provide that the activities and services for which assistance under this Act is sought will be administered by or under the supervision of the public component applicants." Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1060.

A companion bill (P.A. 77—1892) appropriated $5,000,000 to carry out the provisions of the Act.

So far as the record shows, no board has been appointed, and no grants have been made. It is obvious that the implementation of the Act may give rise to extremely serious constitutional questions. It is possible that the activities of nonpublic schools, ranging through a comprehensive catalogue of educational activities, will be subject to the fiscal control of the public school district or public school teachers, with resulting entanglement. It is also possible that those activities, financed with public funds and conducted in the nonpublic schools, will go without supervision (see, Gianella, Lemon and Tilton: The Bitter and Sweet of Church-State Entanglement, 1971 S. Ct. Rev. 147, 163-6), thus presenting questions as to whether the State has performed its constitutionally compelled duty, as described in *Levitt,* "to assure that the state-supported activity is not being used for religious indoctrination." (413 U.S. 472, 480, 37 L. Ed. 2d 736, 743, 93 S. Ct. 2814, 2819.) On the other hand, it is possible that none of these contingencies may occur.

In our opinion it is neither feasible nor appropriate to attempt at this time, in the absence of any effort at implementation, to determine the validity of the multitudinous activities authorized by the Illinois Educational Development Act. The judgment of the circuit court of Cook County, insofar as it sustained the validity of Public Act 77—1895, is therefore reversed.

The judgment of the circuit court of Cook County with respect to Public Act 77—1890 is affirmed; its judgment with respect to Public Act 77—1891 and Public Act 77—1895 is reversed.

*Affirmed in part and reversed in part.*

MR. JUSTICE KLUCZYNSKI, dissenting:

I agree with the majority disposition of Public Act 77—1890, which attempted to provide a monetary reim-

bursement to qualified parents who send their children to nonpublic schools. However, I disagree with the resolution of Public Act 77—1891 (Books and Services Act) and Public Act 77—1895 (Educational Development Board Act).

The majority finds it unnecessary to determine whether the State grants for secular textbooks services to nonpublic schools are paid to the respective school districts or the parents of nonpublic school students. The plain reading of section 8 of Public Act 77—1891 (Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1028) demonstrates that the payments *are payable by the State to the local school district which is liable to account for its expenditures in this program to State authorities.*

Despite the United States Supreme Court ruling in *Board of Education v. Allen, 392 U.S. 236, 20 L. Ed. 2d 1060, 88 S. Ct. 1923,* that upheld the State's authority to loan secular textbooks to nonpublic school students, the majority herein has determined that the present statute, which is analogous to that involved in *Allen,* is constitutionally deficient under the first amendment. The majority premises its position on several grounds. It says that the statute expressed an erroneous philosophy for the reason that the State does not have a "duty" to provide such aid nor are any parents "entitled" to reimbursement for their expenses incurred in providing their children with private schooling. It evidently reasons that all students are not treated alike. The majority further finds fault in such aid because it believes that the State subsidizes textbook expenses for nonpublic school students while local taxpayers bear the burden of supplying these same items for secular institutions. It concludes that parents of nonpublic school children obtain an economic benefit to the exclusion of other parents.

I disagree with these premises. In *Allen* the statute at issue imposed a *duty* upon local school boards to purchase and loan secular textbooks, upon request, to nonpublic

school students. (392 U.S. 236, 239 n.3, 20 L. Ed. 2d 1060, 1063 n.3, 88 S. Ct. 1923.) In *Board of Education v. Bakalis, 54 Ill.2d 448,* we upheld the statutory requirement of local school boards to provide the same transportation facilities to nonpublic school students as those provided to public school pupils. From the statute considered in *Bakalis* it is possible to conclude that a nonpublic school student became *entitled* to this transportation. It is further evident that such aid could conceivably reduce one of the possible expenses attendant to a private education. I must conclude in light of *Allen* and *Bakalis* that the first basis which the majority utilizes to disallow secular textbook aid presents a semantical rather than constitutional objection.

I do not find the majority rationale convincing that all students are not treated alike. It is obvious to me that a public school student who rents or is loaned his text material is treated exactly the same as his nonpublic school counterpart who receives the same items under the same distribution terms. The majority position also seems to be founded on its objection as to who will bear the tax burden of implementing this program. At the outset of the majority opinion three factors are specified for determination as to whether legislation violates the establishment clause of the first amendment. The majority opinion fails to demonstrate how its position is related to any of these criteria. Moreover, all local taxpayers contribute to support of local schools while all taxpayers throughout the State would contribute to support programs involved in Public Act 77—1891. There is no contention that each taxpayer within his respective classification would not be treated equally, and even if such argument was made it would arise from a violation under the fourteenth rather than first amendment. (See *People ex rel. County Collector of Cook County v. Northwestern University, 51 Ill.2d 131.*) Nor can the majority construe secular textbook aid as improper because it confers an economic benefit, upon

request, to those parents who choose to send their children to nonpublic schools by reducing a possible expense attendant thereto. This position was specifically rejected in the *Allen* decision. 392 U.S. at 243-44, 20 L. Ed. 2d at 1066.

I would thus uphold that portion of the circuit court's judgment which sustains secular textbook assistance to nonpublic school students under the rationale of *Allen,* whose principle has been continuously reaffirmed by the United States Supreme Court. *Sloan v. Lemon, 413 U.S. 825, 832, 37 L. Ed. 2d 939, 945, 93 S. Ct. 2982; Committee for Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 775, 37 L. Ed. 2d 948, 964, 93 S. Ct. 2955, 2966; Levitt v. Committee for Public Education and Religious Liberty, 413 U.S. 472, 481, 37 L. Ed. 2d 736, 743, 93 S. Ct. 2814, 2819; Lemon v. Kurtzman, 403 U.S. 602, 616, 29 L. Ed. 2d 745, 758, 91 S. Ct. 2105.*

The majority further invalidates those statutory provisions in Public Act 77—1891 which would provide for "School Health Services," such as physician, surgical, nursing and dental care, to nonpublic school students. The majority concedes that these services "are either purely secular or they can be determined to be secular without such policing as would amount to 'excessive entanglement.' " However, the majority overturns these programs, concluding again that they do "not treat all students alike. *** services furnished to nonpublic school students *** are paid for by the State; those furnished to public school students are paid for by local taxpayers."

I have heretofore expressed my views concerning the propriety of such reasoning and need not reiterate them. Additionally I believe that the majority deems *Sloan v. Lemon, 413 U.S. 825, 37 L. Ed. 2d 939, 93 S. Ct. 2982,* of controlling significance to resolution of both textbook aid and the medical, dental and other associated auxilary programs. In *Sloan* a State plan for tuition reimbursement

to parents of nonpublic school students was determined to be violative of the first amendment. In viewing the substance of that legislation the United States Supreme Court differentiated between those State programs which conferred " 'indirect' and 'incidental' benefits" to all parents regardless of whether their children attended public or nonpublic schools and those plans which resulted in the " 'sponsorship' or 'financial support' of religion or religious institutions." (413 U.S. at 832-3, 37 L. Ed. 2d at 945, 93 S. Ct. at 2987.) It is plainly evident that *Sloan* does not support the majority position.

I would hold that the medical and the related auxiliary services in Public Act 77—1891 are proper. It is apparent that these programs cannot be considered a direct or substantial attempt to benefit religious education. Rather they are designed to insure the general health and safety of all children without regard to the educational system their parents choose. The United States Supreme Court has upheld the constitutionality of similarly designed legislation (see *Everson v. Board of Education, 330 U.S. 1, 91 L. Ed. 711, 67 S. Ct. 504; Lemon v. Kurtzman, 403 U.S. 602, 616, 29 L. Ed. 2d 745, 758, 91 S. Ct. 2105*), and such view is not without support in this court. *Board of Education v. Bakalis, 54 Ill.2d 448, 473* (Ryan, J., specially concurring).

The majority strikes down the other auxiliary services (guidance counseling, psychological services, remedial and therapeutic programs for educationally disadvantaged children) established by Public Act 77—1891. Despite the circuit court's determination that the services will be secular in nature, the majority concludes that these programs "are not susceptible of supervision to assure strictly secular content." It relies upon *Levitt v. Committee for Public Education and Religious Liberty, 413 U.S. 472, 37 L. Ed. 2d 736, 93 S. Ct. 2814.* In *Levitt* the statute provided that nonpublic schools were to be given State tax monies to reimburse these institutions for testing

services. Compensation was given on a *per*-pupil basis and included expenses for State-required tests as well as those drafted by nonpublic school teachers. The latter category was found to comprise the overwhelming majority of tests given. It was further noted that there was no auditing system to determine if the amount of funds provided exceeded actual costs, nor was there a provision for the return of funds not used for testing. The Supreme Court found that the statute "as written and applied by the Commissioner of Education" was violative of the first amendment because the statute did not set forth safeguards nor were other means available to prevent a substantial risk that tests composed by private school teachers would consciously or otherwise contain religious instruction. 413 U.S. at 479, 37 L. Ed. 2d at 742, 93 S. Ct. at 2818-2819.

*Levitt* is inapplicable to the present case. Here, section 16 of Public Act 77–1891 mandates that proper accounting procedures be adopted to accurately determine the amount of funds used for these auxilary services (Ill. Rev. Stat., 1972 Supp., ch. 122, par. 1036), and, as the majority recognizes, this amount is payable to the public school districts and not to nonpublic schools. I also believe that this statute envisions that these auxilary services, unlike *Levitt,* be furnished by the local school district and would not in any manner be controlled or influenced by the nonpublic school or its employees. Sections 17 and 18 of Public Act 77–1891 additionally permit each school district and the Superintendent of Public Instruction to adopt rules and regulations pertinent to the implementation of the Act. (Ill. Rev. Stat., 1972 Supp., ch. 122, pars. 1037, 1038.) This feature further distinguishes the present case from *Levitt,* for here exists statutory authorization which may permit adoption of any necessary additional safeguards relative to the auxilary programs to prevent the intrusion of religious precepts by means of appropriate rules and regulations. The aforementioned characteristics

may make possible a strictly secular program content and may obviate any inherent potential conflict which the majority fears.

Public Act 77—1891 was passed by the General Assembly on June 27, 1972 (Laws of 1972, vol. 1, p. 258), and became effective on July 1, 1972. This action was commenced immediately thereafter. The record does disclose that proposed rules and regulations had been formulated to implement Public Act 77—1891, and it was further established that they might be altered. The circuit court found that these administrative regulations did not create an excessive entanglement between the State and religious institutions. However, it would appear from that court's opinion that no determination was made as to whether these rules and regulations were sufficient to insure the secular content of the auxilary programs. I would therefore vacate the judgment of the circuit court as it pertains to these services and remand the matter to that court to consider the latter issue. Upon remand the appropriate public officials, who are presumed to act in accordance with law (*City of Chicago v. Ben Alpert, Inc., 368 Ill. 282, 288*), might deem it necessary to revise the rules and regulations thereby curing any deficiency which might exist relative to safeguarding the secular content of these programs. Until such determination is made, I would reserve constitutional consideration of several of the auxilary service programs established by Public Act 77—1891.

In regard to Public Act 77—1895 the majority concludes that, absent the implementation of the statutory directives, resolution of its constitutionality cannot occur, yet it reverses the circuit court judgment that this statute is valid. I would uphold the circuit court determination, based upon the presumption of constitutionality attendant to legislative enactments. (*North Shore Post No. 21 of the American Legion v. Korzen, 38 Ill.2d 231, 233*), as well as upon evidence contained in the record which

reflects that this statute will be implemented under rules and regulations similar to those promulgated by the Federal government under Title III (20 U.S.C. sec. 841 *et seq.*), which established a comparable Federal program. Moreover, the majority's reversal leaves unclear the status of this legislation. This action originated because the Auditor of Public Accounts was in doubt as to the constitutionality of the several statutes and thus refused to process vouchers or issue warrants pursuant thereto. This doubt has not been resolved, and, by setting aside the circuit court order for a writ of *mandamus,* implementation of Public Act 77–1895 may be precluded.


MR. JUSTICE WARD, also dissenting:

I would add that it is not clear from the majority's opinion whether it considers objectionable the provision in Public Act 77–1891 that if a school district loans textbooks free to its public school students it shall loan them free to nonpublic school students at parental request.

If it does judge this provision to be unconstitutional, it is of course at variance with the holding in *Board of Education v. Allen, 392 U.S. 236, 20 L. Ed. 2d 1060, 88 S. Ct. 1923.* See also *Sloan v. Lemon, 413 U.S. 825, 37 L. Ed. 2d 939, 93 S. Ct. 2982.*

If it does acknowledge that the provision is constitutional, I would note the regrettable failure of the majority to consider the effect here of the severability clauses inserted by the legislature for consideration in the event part of the legislation were to be judged invalid. See *People ex rel. Du Page County v. Smith, 21 Ill.2d 572, 586.*