WILLIAM D. GAFFNEY ET AL., APPELLEES, V. STATE DEPARTMENT OF EDUCATION ET AL., APPELLANTS.

220 N. W. 2d 550

Filed July 25, 1974. No. 38957.

Clarence A. H. Meyer, Attorney General, and Chauncey C. Sheldon, for appellants.

William J. Hotz, Jr., of Hotz, Byam & Kellogg, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

WHITE, C. J.

At issue in this appeal is the constitutionality, under the Constitution of Nebraska and the Constitution of the United States, of the "Nebraska Textbook Loan Act," originally L. B. 659, Laws 1971, now sections 79-4,118, 79-4,118.01, 79-4,119, and 79-1338, R. R. S. 1943. Generally, the legislative program embodied in these sections of the statute and in L. B. 659 intended to provide financial assistance to nonpublic elementary and sec-

ondary schools through the loan of secular textbooks by public school district boards of education. The plaintiffs, pursuant to section 79-4,118, R. R. S. 1943, requested the free loan of textbooks from the Omaha Public School District, on behalf of their children who were enrolled in a private parochial school. Their request was forwarded to the Nebraska Department of Education. On advice from the Attorney General, the Nebraska Department of Education advised the school district to take no action implementing the Nebraska Textbook Loan Act until there had been a determination of its constitutionality. The plaintiffs then brought this declaratory judgment action seeking to have the law declared valid. The District Court, in a judgment entered on December 1, 1972, declared the act constitutional. On appeal we hold that the Nebraska Textbook Loan Act is unconstitutional under the Constitution of Nebraska. Accordingly, the judgment of the District Court is reversed.

In pertinent part the Nebraska Textbook Loan Act, L. B. 659, Laws 1971, provides as follows: (1) A general declaration of legislative policy and purpose to aid education and develop the resources and skills of youths that the state and local communities should retain primary responsibility for public education, and that the public welfare and safety of the state require that the state give assistance to educational programs which are important to the *national defense and the general welfare of the state*. (2) Section 79-4,118, R. R. S. 1943, provides as follows: "Boards of education shall have the power and duty to purchase and to loan textbooks to all children who are enrolled in grades kindergarten to twelve of a public school and, upon individual request, to children who are enrolled in grades seven to twelve of a *private school* which is *approved* for continued legal operation *under rules and regulations established by the State Board of Education* pursuant to subdivision (c) of subsection (5) of section

79-328. Textbooks loaned to children enrolled in grades seven to twelve of such private schools shall be textbooks which are designated for use in the public schools of the school district. *Such textbooks are to be loaned free to such children subject to such rules and regulations as are or may be prescribed by such boards of education."* (3) Section 79-4,119, R. R. S. 1943, provides that for the "purpose of paying for school books, equipment, and supplies, the school district officers may draw an order on the district treasurer" for the payment of school books, equipment, and supplies; and further provides that each school district shall receive from the School Foundation and Equalization Fund an amount equal to the cost of textbooks purchased and loaned by the district, subject to certain maximums of reimbursement, and then section 79-1338, R. R. S. 1943, provides for the bookkeeping scheme by which the funds provided for are paid for by the state. (4) The title to the Act states only one purpose, "to provide for purchase and loan of textbooks by school districts to children enrolled in private schools; * * *" and to accomplish that purpose the Act only amends previous sections 79-4,118 and 79-4,119, R. R. S. 1943, and section 79-1338, R. S. Supp., 1969.

We discuss first the issue of constitutionality under Article VII, section 11, of the Constitution of Nebraska. It provides in part: "Neither the state Legislature nor any county, city or other public corporation, shall *ever* make *any appropriation* from any public fund, or grant any public land *in aid of any sectarian* or denominational *school or college,* or any educational institution which is not *exclusively owned and controlled* by the *state* or a *governmental subdivision* thereof." (Emphasis supplied.)

It seems to us that to state the constitutional provision is to answer our question. By its terms the provisions furnish aid (in the form of textbooks) to private sectarian schools. By its terms the cost is paid by a public

appropriation of tax funds. By its terms textbooks must be used and are given in aid of students in educational institutions which are not exclusively owned and controlled by the state or a governmental subdivision thereof.

The question, if we can call it that, here presented, is fundamentally different than the one presented by state action involving an examination of the standards set up by the United States Supreme Court under the Establishment Clause of the First Amendment. It is true the question under the Constitution of Nebraska and the Constitution of the United States both relate to the overall principle of separation of church and state. But, by its terms, the Constitution of Nebraska does not permit of an examination of secular or sectarian purposes, a determination of primary or incidental benefit, or a balancing of the issues involved in state-church entanglement and political divisiveness. There is no ambiguity in our constitutional provision. The impact of the language and its purpose can be understood by any literate person. The standards are not secular purpose, primary aid, or political divisiveness and state-church entanglement. They are whether there is a public appropriation, whether the grant is in aid of any sectarian or denominational school or college, and, perhaps more importantly, the meaning of these two terms, if they would require any further definition, is fastened down unequivocally, fundamentally, and permanently by the statement that any educational institution which receives such aid must be exclusively owned and controlled by the state or a governmental subdivision thereof.

Constitutional and statutory provisions are not open to construction as a matter of course. It would be difficult to find a constitutional or statutory provision that is more precise in its meaning, purpose, and terms. It says what it means and means what it says. We therefore resort to the proceedings in the Constitutional

Convention of 1919-1920 only for the purpose of demonstrating the transcendent purpose and thrust of the design and purpose of this amendment. In the proceedings of the 1919-1920 Constitutional Convention, the following are pertinent excerpts from the Convention proceedings: "As far as I am personally concerned, I desire to have the Constitution prohibit any state aid under any guise to any educational institution other than the public school. It is not a difficult matter, if the Legislature sees fit to find an excuse in the interests of general welfare, to make donations under the guise of military training or normal training or what not, in a private institution. I have absolutely no hostility to those institutions, but it will invariably bring on the kind of *war fare* that this state should stay clear from, if you mingle the *state* and *church* even to that extent. * * *

"* * * The state might desire to adopt the policy, instead of extending its own plan for normal schools, to utilize the denominational schools. * * *

"I am opposed to that principle. * * *

"Mr. Taylor: This amendment simply does this: It prohibits the *aiding by the state of any schools other than those owned and controlled by the state or its subdivisions*. It makes that matter plain and the amendment ought to be adopted." (Emphasis supplied.) Vol. II, Proceedings of the Constitutional Convention, 1919-1920, pp. 2661, 2678, 2680.

We come to the conclusion that by its terms, by its history, and by its purpose, that the intent of the amendment was, and is, to prohibit the extension of aid from public funds to nonpublic schools, in any manner, shape, or form.

The attempt to transpose and inject the First Amendment by carrying on tests of secular purpose, primary effect of aiding religion, and governmental entanglement or political divisiveness, into the interpretation of a state constitutional provision such as ours, must be rejected. By its terms, the criteria of our state

constitutional provision do not permit an examination of the now challenged distinction between secular or sectarian purposes, nor do they permit an examination of a scheme to determine the elusive distinction between primary or incidental benefit, nor an examination into the areas of surveillance, entanglement, and political divisiveness. By its terms the language of the constitutional provision was designed to prevent reexamination and circumvention of its purpose, by the categorical objective requirement that there shall be no aid or appropriation to any school or institution of learning *not owned or exclusively controlled* by the state. Almost incredibly prophetic is the previously quoted statement in our Constitutional Convention of 1919-1920, that "it will invariably bring on the kind of *war fare* that this state should stay clear from, * * *." The argument goes on in an avalanche of cases and statutes under the First Amendment as to how far the door should be opened and when the "verge" that Justice Black announced in Everson v. Board of Education, 330 U. S. 1, 67 S. Ct. 504, 91 L. Ed. 711, should be reached or extended. But surely no detached examination of our constitutional provision, its history, and declared purpose can come to any other conclusion than that the State of Nebraska attempted to avoid even opening the door to an involvement in the political, legislative, and judicial disputes involved in determining hairline and illusory distinctions of degree. The Constitution neither commands nor permits any financial aid by way of public appropriation. It does not limit it, it says there shall be no aid at all. Relevant here is this excerpt from Madison's classic statement in his Remonstrance. It is: "That the same authority which can force a citizen to contribute three pence only of his property for the support of any one establishment, may force him to conform to any other establishment in all cases whatsoever."

Other states having similar or identical constitutional provisions to that of Nebraska have come to the same

conclusion as we have hereinbefore expressed. We cite only those most pertinent. In Almond v. Day, 197 Va. 419, 89 S. E. 2d 851, the Virginia court declared unconstitutional an act appropriating funds with which to provide tuition, institutional fees, board and room, *books and supplies,* at nonpublic schools which had been approved by the Superintendent of Public Instruction. Our constitutional provision is identical with theirs. Said the Virginia Supreme Court: "It will be observed that the prohibition in Section 141 is in broad and inclusive language. It says, '*No appropriation of public funds shall be made to any school or institution of learning not owned or exclusively controlled by the State or some political subdivision thereof*' with two provisos or exceptions then spelled out. The effect is thus to prohibit all appropriations of public funds to institutions of learning other than those expressly permitted. The prohibition is against any or all aid to the excluded institutions." (Emphasis supplied.)

In Dickman v. School District No. 62C, 232 Ore. 238, 366 P. 2d 533, the Oregon Supreme Court passed on the constitutionality of a statute providing for the furnishing of free textbooks to all children, including those attending nonpublic schools. The Constitution of the State of Oregon provided in part: "No money shall be drawn from the Treasury for the benefit of any religious, or theological institution * * *." We note that the constitutional provision does not even approach the prohibitory conciseness, definiteness, and definitiveness of our own constitutional provision. In this case the statute provided for the loan of textbooks to individual children, the same as here, but observed that in practice, as here, the books would be delivered to the authorities in charge of the schools, and would furnish an integral part, as all textbooks do, in the educational secular effort in the parochial schools. The court held the act unconstitutional and in closing stated as follows: "We are not unmindful of the fact that parents who send their

children to Catholic schools must bear the double burden of supporting not only their parochial schools but the public schools as well. But the added burden is self-imposed; instruction in the public schools is available to all. Catholic schools operate only because Catholic parents feel that the precepts of their faith should be integrated into the teaching of secular subjects. Those who do not share in this faith need not share in the cost of nurturing it."

The State of Idaho has a constitutional provision almost identical to ours. In Epeldi v. Engelking, 94 Idaho 390, 488 P. 2d 860, the Supreme Court of Idaho, in striking down a provision for busing parochial students, *under its state constitutional provision,* said as follows: "This section in explicit terms prohibits any appropriation by the legislature or others (county, city, etc.) or payment from any public fund, *anything in aid* of any church or to help support or sustain any sectarian school, etc. By the phraseology and diction of this provision it is our conclusion that the framers of our constitution intended to more positively enunciate the separation between church and state than did the framers of the United States Constitution. Had that not been their intention there would have been no need for this particular provision, because under Idaho Const. art. 1, § 3, the exercise and enjoyment of religious faith was guaranteed (comparable to the free exercise of religion guaranteed by the First Amendment of the United States Constitution) and it further provides no person could be required to *attend* religious services or *support* any particular religion, or pay tithes against his consent (comparable to the establishment clause of the First Amendment).

"The Idaho Const. art. 9, § 5, requires this court to focus its attention on the legislation involved to determine whether it is in 'aid of any church' and whether it is 'to help support or sustain' any church affiliated school. The requirements of this constitutional provi-

sion thus eliminate as a test for determination of the constitutionality of the statute, *both the 'child benefit' theory discussed in Everson v. Board,* supra, and the standard of Board of Education v. Allen, supra, i.e., whether the legislation has a 'secular legislative purpose and a primary effect that neither advances nor inhibits religion.' In this context, while we recognize that even though this legislation does assist the students to attend parochial schools, *it also aids those schools by bringing to them those very students for whom the parochial schools were established.* Thus, it is our conclusion that this legislation, the effect of which would be to aid the school, is prohibited under the provisions of Idaho Const. Art. 9, § 5." (Emphasis supplied.)

The plaintiffs nevertheless attempt to escape the direct impact of the language of our constitutional provision by arguing extensively that the furnishing of the textbooks to the students is an aid to the students and not to the school. This argument was exhaustively answered in our recent opinion in State ex rel. Rogers v. Swanson, *ante* p. 125, 219 N. W. 2d 726. Therein we quoted extensively from both state and federal cases that explore and deny a contention that ignores substance for form, reality for rhetoric, and would lead to total circumvention of the principles of our Constitution and the First Amendment to the Constitution of the United States. In State ex rel. Rogers v. Swanson, *supra,* this court said: "In Committee for Public Education & Religious Liberty v. Nyquist (1973), 413 U. S. 756, 93 S. Ct. 2955, 37 L. Ed. 2d 948, the Supreme Court had before it a New York law granting tuition reimbursement and tax benefits to the parents of elementary and secondary private school students. The court stated: 'As Mr. Justice Black put it quite simply in Everson: "No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." 330 U. S. at 16.

" 'The controlling question here, then, is whether the fact that the grants are delivered to parents rather than schools is of such significance as to compel a contrary result. * * * Indeed, it is precisely the function of New York's law to provide assistance to private schools, the great majority of which are sectarian. By reimbursing parents for a portion of their tuition bill, the State seeks to relieve their financial burdens sufficiently to assure that they continue to have the option to send their children to religion-oriented schools. And while the other purposes for that aid — to perpetuate a pluralistic educational environment and to protect the fiscal integrity of over-burdened public schools —. are certainly unexceptionable, the effect of the aid is unmistakably to provide desired financial support for nonpublic, sectarian institutions. * * *

" 'First, it has been suggested that it is of controlling significance that New York's program calls for reimbursement for tuition already paid rather than for direct contributions which are merely routed through the parents to the schools, in advance of or in lieu of payment by the parents. The parent is not a mere conduit, we are told, but is absolutely free to spend the money he receives in any manner he wishes. * * * A similar inquiry governs here: if the grants are offered as an incentive to parents to send their children to sectarian schools by making unrestricted cash payments to them, the *Establishment Clause is violated whether or not the actual dollars given eventually find their way into the sectarian institutions. Whether the grant is labeled a reimbursement, a reward or a subsidy, its substantive impact is still the same.*'

"To the same effect is Sloan v. Lemon (1973), 413 U. S. 825, 93 S. Ct. 2982, 37 L. Ed. 2d 939, wherein it was said: 'The State has singled out a class of its citizens for a special economic benefit. Whether that benefit be viewed as a simple tuition subsidy, as an incentive to parents to send their children to sectarian schools, or

as a reward for having done so, at bottom its intended consequences is to preserve and support religion-oriented institutions.' See, also, Almond v. Day, 197 Va. 419, 89 S. E. 2d 851; Hartness v. Patterson, 255 S. C. 503, 179 S. E. 2d 907; Wolman v. Essex, 342 F. Supp. 399, affirmed 409 U. S. 808, 93 S. Ct. 61, 34 L. Ed. 2d 69; Kosydar v. Wolman, 353 F. Supp. 744, affirmed, 413 U. S. 901, 93 S. Ct. 3062, 37 L. Ed. 2d 1021; Public Funds for Public Schools of New Jersey v. Marburger, 358 F. Supp. 29; People ex rel. Klinger v. Howlett (1973), 156 Ill. 2d 1, 305 N. E. 2d 129.

"Although these cases dealt with questions arising under the First Amendment to the Constitution of the United States, they specifically hold that tuition allowances from public funds to *parents of students* are, in effect, appropriations for, or in aid of, private schools, and as such are impermissible. *Direct allowance of such tuition funds to the students as distinguished from their parents is immaterial.* The same factors are present. *It is a patent attempt to sanction by indirection that which the Constitution forbids."* (Emphasis supplied.)

Committee for Public Education & Religious Liberty v. Nyquist (1973), 413 U. S. 756, 93 S. Ct. 2955, 37 L. Ed. 2d 948, dealt with nonideological subsidies for repairs and maintenance, and instructional materials and supplies, as well as tuition grants. The other cases cited deal mainly with tuition grants and some with textbook loans to students. Besides the other lessons that these cases teach, it is indisputable that channeling the aid to the parents or to the students when such aid is used as an integral part of the education received in the private or parochial school, is an impermissible circumvention and is unconstitutional.

All these cases emphasize that the court must examine the character of the aided activity rather than the manner or the form in which aid is given. We point out further that one of the main purposes of the parent sending his child to a parochial school is to insure the early

inculcation of religion. Assuming that textbooks promote the notion of an absolutely neutral and equal secular educational program, the reimbursement or the loan of textbooks to the students is for the purpose of augmenting the public school secular education with religious training. The state, by aiding the parents and the students by textbooks, secular though they may be, is providing a program for aiding the church and in advancing religious education. It is clear to us the fact that the benefit of the secular textbooks goes originally to the student rather than directly to the school is a mere conduit and does not have the cleansing effect of removing the identity of the ultimate benefit to the school as being public funds. And interwoven with this situation, realism demands that we see that free textbook loans may be, and it is reasonably probable that they are, the circumstance which determines whether a given pupil will remain in a parochial school or in a public school. The granting of free textbook loans to a parochial school student lends strength and support to the school and, although indirectly, lends strength and support to the sponsoring sectarian institution.

We therefore hold, under Article VII, section 11, of the Constitution of Nebraska, that L. B. 659 is unconstitutional and that the District Court was in error in holding to the contrary.

Having reached this decision under the Constitution of Nebraska, we find it unnecessary to pass on or determine the question of whether the Nebraska Textbook Loan Act is unconstitutional under the Establishment Clause of the First Amendment to the Constitution of the United States.

The judgment of the District Court finding the Act constitutional is reversed and the cause remanded.

REVERSED AND REMANDED.

CLINTON, J., dissenting. McCOWN, J., joining.

L. B. 659, Laws 1971, held by the majority opinion to be unconstitutional, does two things. First, it imposes

upon boards of education the duty to purchase and loan textbooks to all children in grades kindergarten through 12 of the public schools and, upon individual request, to loan textbooks to children enrolled in grades 7 to 12 of those private schools approved for operation under section 79-328(5)(c), R. R. S. 1943. The textbooks to be loaned were those designated for use in the public schools. Secondly, it provides that the public school districts should be reimbursed from state funds for the cost of the textbooks purchased and loaned to both classes of students. These state funds were not to exceed an amount equal to an average of $15 per pupil for those enrolled in grades 7 to 12 in the public and private schools within the district for certain named years and not to exceed $10 per pupil per year thereafter.

The act recites that its purpose is, among others, to afford more adequate educational opportunities and that these purposes are important for the general welfare of the state.

The determination of the constitutionality of any legislative act may require the examination of several sections of our Constitution. In this case it seems clear that the majority has not only had to twist the language of Article VII, section 11, but also has disregarded other pertinent constitutional provisions which, in my judgment, seem to remove any doubt whatsoever as to the correct construction and interpretation of Article VII, section 11. Likewise, they have paid scant attention to what seems to be the most direct and weighty authority in point. We will discuss the latter assertion first.

In Board of Education of Central School Dist. No. 1 v. Allen, 27 App. Div. 2d 69, 276 N. Y. S. 2d 234, 20 N. Y. 2d 109, 281 N. Y. S. 2d 799, 228 N. E. 2d 791, there was considered a New York statute which in substance is the same as the one here involved, and a provision of the New York Constitution just as or more restrictive than our own constitutional provision. The New York

Court of Appeals upheld the constitutionality of the statute under the provisions of the state Constitution. Its decision on the separate but related question of constitutionality under the Establishment Clause of the First Amendment was reviewed by the Supreme Court of the United States in Board of Education v. Allen, 392 U. S. 236, 88 S. Ct. 1923, 20 L. Ed. 2d 1060. The court necessarily had to consider whether a benefit accrued to the private schools. In other words, it had to determine whether there was an aid to the schools. The concept considered by the Supreme Court of the United States was essentially the same as that involved in the state constitutional question and the one before us here.

The New York Court of Appeals said: "Since we must reach the merits in this case, we come to the question whether this statute violates section 3 of article XI of the New York State Constitution: 'Neither the state nor any subdivision thereof shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for the examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught . . .' . . .

"The purpose underlying section 701, found in the Legislature's own words (L. 1965, ch. 320, § 1, supra), belies any interpretation other than that the statute is meant to bestow a public benefit upon all school children, regardless of their school affiliations. There can be no serious suggestion that the declaration of purpose by the Legislature was a verbal smoke screen designed to obscure a nefarious scheme to circumvent the New York State Constitution. No one in the last third of the 20th Century can doubt that a program aimed at improving the quality of education in all schools is a matter of legitimate State concern.

"Since there is no intention to assist parochial schools

as such, any benefit accruing to those schools is a collateral effect of the statute, and, therefore, cannot be properly classified as the giving of aid directly or indirectly. . . .

"Having decided that section 701 entails no aid to the parochial schools, we thus hold that there is no Federal constitutional question under the establishment clause of the First Amendment. The State makes no affirmation of religious beliefs or activities within the public schools. Section 701 remains completely neutral with respect to religion, merely making available secular textbooks at the request of the individual student and asking no question about what school he attends. Despite the flexibility of the English language, it is impossible to conclude that loaning nonreligious textbooks to all students, including those who attend a parochial school, establishes a religion or constitutes the use of public funds to aid religious schools (cf. Everson v. Board of Educ., 330 U. S. 1, 16, 18)." Board of Education of Central School Dist. No. 1 v. Allen, *supra.*

The Supreme Court of the United States said: "The express purpose of § 701 was stated by the New York Legislature to be furtherance of the educational opportunities available to the young. Appellants have shown us nothing about the necessary effects of the statute that is contrary to its stated purpose. The law merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools. Perhaps free books make it more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in Everson and does not alone demonstrate an unconstitutional degree of support for a religious institution." Board of Education v. Allen, *supra.*

Our own Constitution prohibits an "appropriation . . . in aid of . . . [the] institution." In 1972 the constitutional provision was amended to provide: "Appropriation of public funds shall not be made to any school or institution of learning not owned or exclusively controlled by the state or a political subdivision thereof.

"All public schools shall be free of sectarian instruction.

"The state shall not accept money or property to be used for sectarian purposes; Provided, that the Legislature may provide that the state may receive money from the federal government and distribute it in accordance with the terms of any such federal grants, but no public funds of the state, any political subdivision, or any public corporation may be added thereto." Art. VII, § 11, Constitution of Nebraska.

We must decide the question, of course, under the language of the Constitution in effect at the time of the enactment of the statute. Central Nat. Bank v. Sutherland, 113 Neb. 126, 202 N. W. 428.

The majority opinion chooses to disregard and significantly, we believe, fails to mention the stipulated facts upon which the case was tried as though those facts were irrelevant. The stipulation provides: "The plaintiffs in the case of each of their children attending private grade schools and private high schools and on behalf of each of their children have been required to purchase or rent text books for use in their children's classes." It is further stipulated that the cost of "book fees" is in the amount of $25 for each child. "The cost of providing textbooks has been and will be a continuing financial burden upon plaintiffs and further that they are members of a class intended to be aided by L. B. 659." It is clear that the Textbook Loan Act does not relieve the private school of any of its obligations. It receives no aid or benefit and obtains no more dollars than it would otherwise have. The legislation in question seems clearly to be public benefit legislation apply-

ing alike to children in all schools and gives a certain modest measure of financial relief to all parents from the tax sources to which all alike contribute. Such legislation has a long history of legislative and judicial approval going back at least to 1929.

In Borden v. Louisiana State Board of Education, 168 La. 1005, 123 S. 655, 67 A. L. R. 1183, the Supreme Court of Louisiana considered a statute similar to the one here considered and a comparable state constitutional provision. The court said: 'Section 8 of article 4 prohibits, among other things, the taking of money from the public treasury, directly or indirectly, in aid of any church, sect, or denomination of religion, or in aid of any priest, preacher, minister, or teacher of religion as such, or for private, charitable, or benevolent purposes to any person or community, excepting certain institutions conducted under state authority. Section 4 of article 1 relates to the right to worship God according to the dictates of one's own conscience, and prohibits the passage of laws establishing religion, or the free exercise thereof, or the granting of preferences to, or making discriminations against, any church, sect, or religious creed. Section 13 of article 12 prohibits the using of public funds for the support of any private or sectarian school. Section 12 of article 4 prohibits, among other things, the lending, pledging, or granting the funds, credit, property, or things of value of the state or of any political corporation thereof to or for any person or persons, association, or corporation, public or private.

"In our opinion, which is the view of the majority of the court, these acts violate none of the foregoing constitutional provisions. One may scan the acts in vain to ascertain where any money is appropriated for the purchase of school books for the use of any church, private, sectarian, or even public school. The appropriations were made for the specific purpose of purchasing school books for the use of the school children of the state, free of cost to them. It was for their benefit and

the resulting benefit to the state that the appropriations were made. True, these children attend some school, public or private, the latter, sectarian or nonsectarian, and that the books are to be furnished them for their use, free of cost, whichever they attend. The schools, however, are not the beneficiaries of these appropriations. They obtain nothing from them, nor are they relieved of a single obligation, because of them."

This decision of the Louisiana Supreme Court was reviewed by the Supreme Court of the United States in Cochran v. Board of Education, 281 U. S. 370, 50 S. Ct. 335, 74 L. Ed. 913, to determine whether it violated the Fourteenth Amendment to the Constitution of the United States. In an opinion by Mr. Chief Justice Hughes, the court said: "The contention of the appellant under the Fourteenth Amendment is that taxation for the purchase of school books constituted a taxing of private property for a private purpose. Loan Association v. Topeka, 20 Wall. 655. The purpose is said to be to aid private, religious, sectarian, and other schools not embraced in the public educational system of the State by furnishing text-books free to the children attending such private schools. The operation and effect of the legislation in question were described by the Supreme Court of the State as follows (168 La., p. 1020)." The court then quoted a portion of the opinion which we have earlier set forth.

The direct and clear construction contained in the language of the two state Supreme Courts and the Supreme Court of the United States in the foregoing cases is in sharp contrast to the strained construction relied on in the majority opinion in this case which in effect equates the children and the institution.

Other decisions of state Supreme Courts are in point. See, Opinion of the Justices, 109 N. H. 578, 258 A. 2d 343 (1969); Bowerman v. O'Connor, 104 R. I. 519, 247 A. 2d 82 (1968); Chance v. Mississippi State Textbook R. & P. Board, 190 Miss. 453, 200 S. 706. The New

Hampshire Supreme Court said: "Our State Constitution bars aid to sectarian activities of the schools and institutions of religious sects or denominations. It is our opinion that since secular education serves a public purpose, it may be supported by tax money if sufficient safeguards are provided to prevent more than incidental and indirect benefit to a religious sect or denomination. . . .

"Senate Bill 327 would provide for the loan or sale of public school textbooks to pupils enrolled in nonpublic schools. Since the books would be confined to those required for use in public schools, they would presumably include only books on secular subjects. In our opinion this bill if enacted would be constitutional. Board of Education v. Allen, supra; Everson v. Board of Education, supra; Opinion of the Justices, 99 N. Y. 519, supra; Opinion of the Justices, 99 N. H. 536, supra. Our answer presumes that the books will be loaned free of charge, or sold at cost, to the pupils, as this bill provides." Opinion of the Justices, *supra.*

The Supreme Court of Mississippi approved a plan similar to that authorized by our own Legislature. Pertinent portions of the statutes and state Constitution as found in the opinion are these: "It is further provided in section 208 thereof: '. . . nor shall any funds be appropriated toward the support of any sectarian school, or to any school that at the time of receiving such appropriation is not conducted as a free school.'

"Chapter 202, Laws 1940, is an act to establish a State Textbook Rating and Purchasing Board, with power to select, purchase and distribute free textbooks by loaning same to the pupils through the first eight grades in all qualified elementary schools located in the state.

"Section 23 of the act provides as follows:.

" 'This act is intended to furnish a plan for the adoption, purchase, distribution, care and use of free textbooks to be loaned to the pupils in the elementary schools of Mississippi.

" 'The books herein provided by the board shall be distributed and loaned free of cost to the children of the first eight grades in the free public elementary schools of the state, and all other elementary schools located in the state, which maintain elementary educational standards equivalent to the standards established by the state department of education for the state elementary schools.' " Chance v. Mississippi State Textbook R. & P. Board, *supra*.

We now consider the effect of pertinent provisions of our own Constitution in addition to Article VII, section 11, and in so doing quote from our dissent in State ex rel. Rogers v. Swanson, *ante* p. 125, 219 N. W. 2d 726: "The majority opinion completely ignores the mandate of our own Constitution contained in Article I, section 4, which after the provision for freedom of worship, conscience, and the prohibition against compulsory attendance and support of any place of worship and the prohibition of discrimination on account of religious belief or lack of it, goes on to say: *'Religion, morality, and knowledge,* however, being essential to good government, it shall be the duty of the legislature to *pass suitable laws* to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, *and to encourage schools and the means of instruction.'* (Emphasis supplied.) The words in this section of the Constitution directing the passage of suitable laws to encourage schools certainly mean more than a mere statutory exhortation of encouragement. The term 'pass suitable laws' can only mean laws which have an effect and which require implementation. This section of our Constitution cannot refer to the common schools of the state, the mandatory establishment of which is required by the specific provisions of Article VII, section 1, which reads: 'The Legislature shall provide for the free instruction in the common schools of this state of all persons between the ages of five and twenty-one years.' " Article I, section 4, therefore can

refer only to "schools and the means of instruction," other than the public schools lawfully operated under the laws of this state.

The state's interest in education is obviously not limited to children in attendance at public schools. In Meyerkorth v. State, 173 Neb. 889, 115 N. W. 2d 585 (1962), we held that the statutes and regulations concerning parochial, denominational, or private schools providing for compulsory school attendance, certification of teachers, and for operation and supervision of said schools are not unconstitutional and were a valid exercise of the police power of the state. In so holding we said: "The above-cited statutes set up a standard for a good education. They allow churches and private groups to establish schools on the same basis. They require each child to be exposed to a school a certain number of months. Private and parochial schools are a part of the educational system of this state." See, also, § 79-1701, R. R. S. 1943.

The constitutionality of the textbook loan act does not, in the light of the totality of the pertinent constitutional provisions and the cited authorities, seem at all doubtful. Even if the constitutionality of the act were doubtful there would be applicable that salutary stricture on our own powers, enunciated innumerable times by us: Statutes are to be upheld by the courts unless unconstitutional beyond reasonable doubt. State v. Standard Oil Co., 61 Neb. 28, 84 N. W. 413 (1900); Smith v. Chicago, St. P., M. & O. Ry. Co., 99 Neb. 719, 157 N. W. 622 (1916); Central Markets West, Inc. v. State, 186 Neb. 79, 180 N. W. 2d 880 (1970); Dwyer v. Omaha-Douglas Public Building Commission, 188 Neb. 30, 195 N. W. 2d 236 (1972).

We would hold that the Legislature was clearly within its constitutional authority in enacting the Nebraska Textbook Loan Act, section 79-4,118, R. R. S. 1943, because it serves a lawful public purpose and does not in fact aid the private school.