[L.A. No. 31358. Aug. 27, 1981.]

CALIFORNIA TEACHERS ASSOCIATION et al., Plaintiffs and Appellants, v.
WILSON RILES, as Superintendent, etc., et al., Defendants and Respondents.

COUNSEL

Mitchel J. Ezer, Allan M. Rosenthal, Fred Okrand, Peter T. Galiano, Raymond L. Hansen, Kirsten L. Zerger and Diane Ross for Plaintiffs and Appellants.

George Deukmejian, Attorney General, Philip C. Griffin, Deputy Attorney General, Thomas M. Griffin and Roger D. Wolfertz for Defendants and Respondents.

Nancy Y. Bekavac and Munger, Tolles & Rickershauser as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**MOSK, J.**—These cases concern the constitutionality of sections 60315 and 60246 of the Education Code, which authorize the Superintendent of Public Instruction to lend, without charge, textbooks used in the public schools to students attending nonprofit nonpublic schools, and which provide funds for that purpose.[1]

---

[1]Section 60315 provides: "The Superintendent of Public Instruction shall lend to pupils entitled to attend the public elementary schools of the district, but in attendance at a school other than a public school under the provisions of Section 48222, the following items adopted by the state board for use in the public elementary schools:

"(a) Textbooks and textbook substitutes for pupil use.

"(b) Educational materials for pupil use.

"(c) Tests for pupil use.

"(d) Instructional materials systems for pupil use.

"(e) Instructional materials sets for pupil use.

"No charge shall be made to any pupil for the use of such adopted materials.

"*Items shall be loaned pursuant to this section only after, and to the same extent that, items are made available to students in attendance in public elementary schools.* However, no cash allotment may be made to any nonpublic school.

"Items shall be loaned for the use of nonpublic elementary school students after the nonpublic school student certifies to the State Superintendent of Public Instruction that such items are desired and will be used in a nonpublic elementary school by the nonpublic elementary school student."

Although this provision allows the state to lend instructional materials to students as well as textbooks, the lending program is in fact confined to textbooks.

The section does not by its terms confine the program to nonprofit nonpublic schools. However, other provisions make it clear that only nonprofit schools are included in the program. Section 60026 defines a "nonpublic school" as a school which satisfies the requirements of section 48222 and is exempt from taxation under section 214 of the Revenue and Taxation Code. The first of these provisions sets forth the requirements

Plaintiffs challenge these provisions on the ground that they violate the establishment clause of the First Amendment to the United States Constitution,[2] article IX, section 8 of the California Constitution, which prohibits the appropriation of public money for the support of sectarian schools or schools not under the jurisdiction of the officers of the public schools,[3] and article XVI, section 5 of our state Constitution, which contains an even broader injunction, forbidding the Legislature to grant "anything to or in aid of" any church or religious sect, or "help to support" any school controlled by a church or a sectarian denomination.[4]

The issues raised by plaintiffs have not previously been decided in this state. ■ For the reasons set forth *infra*, we conclude that the

---

for a private school whose students are exempted from attending public school, and the second exempts from taxation schools of lower than collegiate grade "owned and operated by religious, hospital or charitable funds, foundations or corporations."

Section 60246 provides: "The State Controller shall during each fiscal year, commencing with the 1978-79 fiscal year, transfer from the General Fund of the state to the State Instructional Materials Fund, an amount of thirteen dollars and thirty cents ($13.30) per pupil in the average daily attendance in the public and nonpublic elementary schools during the preceding fiscal year, as certified by the Superintendent of Public Instruction, except that this amount shall be adjusted annually in conformance with the Consumer Price Index, all items of the Bureau of Labor Statistics of the United States Department of Labor, measured for the calendar year next preceding the fiscal year to which it applies. For purposes of this section, average daily attendance in the nonpublic schools shall be the enrollment reported pursuant to Section 33190."

These provisions previously appeared in sections 9505 and 9445. (Stats. 1972, ch. 929, § 2, pp. 1665, 1669.) The original enactments were amended in 1978 to their present form. The amendments are not significant in the determination of the issues before us.

All statutory references are to the Education Code unless otherwise noted. For literary convenience, this opinion will refer hereafter only to section 60315 in discussing the textbook loan program.

[2]The First Amendment to the United States Constitution states, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."

[3]Article IX, section 8 of the California Constitution provides: "No public money shall ever be appropriated for the support of any sectarian or denominational school, or any school not under the exclusive control of the officers of the public schools . . . ."

[4]Article XVI, section 5 states: "Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever. . . ."

statutes challenged by plaintiffs are unconstitutional because they violate the prohibition of article IX, section 8 and article XVI, section 5 of the California Constitution against the appropriation of money for the support of sectarian schools.

Plaintiffs are nonprofit corporations and residents and taxpayers of California. They filed two separate actions for declaratory and injunctive relief against the Superintendent of Public Instruction, the State Board of Education, and the Controller. The first challenged the constitutionality of section 60315 on its face, and the second alleged that the board administered the program in an unconstitutional manner.

The complaint in the first action (No. C-48751) alleged that parochial schools are the primary beneficiaries of the textbook loan program, that these schools have as their purpose the propagation and promotion of the doctrines of a particular religious faith, and conduct their operations to fulfill religious purposes, impose religious restrictions on what can be taught, and blend sectarian and secular instruction. It is further alleged that although section 60315 refers to the loan of books, that terminology is a subterfuge to allow the state to accomplish indirectly what it may not do directly. The complaint continues: the program constitutes a subsidy of public funds to religious schools because it reduces the cost of books to such schools, and it deprives the public school system of funds for its operation. Finally, it is alleged that the cumulative effect of the textbook loan program results in an excessive entanglement between government and religion; secular and religious training in parochial schools are intertwined, and the textbooks furnished by the state are instrumental in teaching religion because the teachers construe the material in the books in a sectarian fashion. Plaintiffs sought a declaration that section 60315 is unconstitutional, and an injunction to prohibit defendants from complying with the provision.

After a trial at which testimonial and documentary evidence was received, the trial court found in favor of defendants, holding that section 60315 is constitutional on its face. The court refused to determine the validity of the practices under which the program is administered, on the ground that the complaint in the first action did not challenge the method of implementation.

However, the trial court directed that a second action be filed challenging the validity of the administration of the program, and following judgment in the first case, plaintiffs filed a second complaint (No.

C-216450) asserting that the program was administered in an unconstitutional manner. The complaint in the second action contained many of the same averments made in the prior pleading, but added detailed allegations describing the implementation of the program. Plaintiffs sought a declaration that these administrative practices are unconstitutional, and an injunction to restrain the State Board of Education from continuing to administer the program in the manner described. The evidence received at the first trial was introduced in the second action, and additional evidence regarding administrative practices of the board was received. The trial court rendered judgment in favor of defendants in the second action as well. The two actions have been consolidated on appeal.

The evidence at the trial in the first case showed that in 1975, 87 percent of the schools participating in the textbook loan program were religious schools, and that schools operated by the Catholic Church comprised 63 percent of the participating schools and 72 percent of the participating religious schools.

The opinion in *Bowker* v. *Baker* (1956) 73 Cal.App.2d 653, 657 [167 Cal.Rptr. 256], to which we shall refer in more detail in a later portion of this opinion, and which involved a statute affording free transportation to students of private schools, explained that the reason it referred to transportation of students attending only Catholic schools was "because of the necessity for exactness in description under the evidence." A similar situation obtains in the present case; in stating the facts, we are compelled to focus on the allegations of the complaint and the evidence admitted at the trial, which centered on characteristics of schools sponsored by the Catholic Church. However, plaintiffs' target in this action, as they made clear at oral argument, is the textbook loan program as it benefits all religious schools, including those operated by various Christian fundamentalists, Jewish, Buddhist, and other denominations.

From the inception of the program in the 1973-1974 academic year to the 1976-1977 year, the cost of the program increased from almost $1.5 million to more than $2 million.

The Catholic schools which participate in the program offer instruction in secular subjects, but they also have as their purpose the teaching of the tenets of their faith. Some of these schools give preference to enrolling Catholic pupils; more than 97 percent of the students attending

such schools are Catholic. The schools ordinarily require students to receive religious instruction, attend religious services during the school day, and participate in prayers and religious ceremonies. Sectarian symbols and pictures are distributed throughout the schools' buildings. The teachers in these schools are for the most part members of the church.

In order to obtain books under the textbook loan program, the parents of the students must sign a general request for textbooks. The names of the books requested are entered on the form by the schools and, in the case of the Catholic schools in Los Angeles, the form is then forwarded to the archdiocese office which, after being assured that the texts requested by the schools are on the approved list of the archdiocese, forwards them to the State Department of Education. The books are shipped directly to the schools, retained by them, and distributed in successive terms to students whose parents sign a request for books. Redistribution continues by the school until the books are worn out or their contents are obsolete. In the latter event, they are not returned to the state, but may be disposed of in any way the religious school sees fit. These specific procedures are not mandated by statute, but have been devised by the State Board of Education to implement the loan program. Public school districts follow a similar procedure for obtaining, distributing and disposing of textbooks, except that the parents of public school pupils are not required to sign a loan request.

A religious school which does not participate in the loan program purchases textbooks and charges the parents of pupils a rental fee for the books. The program here at issue relieves the schools which receive books from the state of the necessity to include these books in their budgets, and thus reduces the rental fee charged to the parents by the schools.

In the first action, the trial court concluded that the textbook loan program has a clearly secular legislative purpose and does not involve the expenditure of public money for the direct benefit of sectarian schools, and that any benefit to such schools, though substantial, is only indirect and incidental. It concluded further that the program does not call for official involvement in the affairs of religious schools resulting in a direct, immediate, and substantial effect of promoting religious purposes.

The court found that plaintiffs had failed to prove the following allegations of their complaint: that the religious schools conduct their

operations to fulfill religious purposes, impose religious restrictions on what can be taught, and blend secular and sectarian instruction, that the budget of the religious schools whose pupils benefit from the program is reduced by the same amount as the cost of the books to the state, an expense which the religious schools would otherwise be required to bear, and that the requirement of section 60315 that the books be lent to nonpublic schools is a subterfuge to allow the state to do indirectly what it cannot constitutionally accomplish directly.

Before we consider whether section 60315 on its face violates the provisions of article IX, section 8, and article XVI, section 5 of the California Constitution, a brief discussion of the principal cases decided by the United States Supreme Court under the establishment clause of the United States Constitution may be helpful.

We begin with the landmark decision in *Everson v. Board of Education* (1947) 330 U.S. 1 [91 L.Ed. 711, 67 S.Ct. 504, 168 A.L.R. 1392], which is the foundation upon which the high court based its later conclusions in this complex and sensitive area of the law. In *Everson*, the court upheld the constitutionality of a New Jersey statute which authorized reimbursement of parents for fares paid by them to transport their children to public or nonprofit private schools, including religious schools, by public carrier. In a five-to-four decision, Justice Black, writing for the majority, held that the legislation did no more than provide a general program to assist parents, regardless of their religion, to get their children to school safely and expeditiously. The court acknowledged that the contribution of tax funds for the support of an institution which teaches the tenets of any church is unconstitutional, but reasoned that providing free transportation to children was a safety measure analogous to providing traffic policemen, fire protection, sewage disposal connections, or streets and sidewalks which serve churches or church schools. In characterizing these public services, the court stated that these were "separate and . . . indisputably marked off from the religious function." (330 U.S. at p. 18 [91 L.Ed. at p. 724].)

The first case after *Everson* dealing with the constitutionality of providing textbooks for use in religious schools was *Board of Education v. Allen* (1968) 392 U.S. 236 [20 L.Ed.2d 1060, 88 S.Ct. 1923]. The court had under consideration a New York law which authorized public school authorities to lend textbooks free of charge to all students in certain grades, including students in private schools. It interpreted *Everson* and subsequent decisions as enunciating the following test for distin-

guishing between forbidden involvement of the state with religion, and involvement permitted by the establishment clause: whether the aid program had a secular legislative purpose, and whether the primary effect neither advanced nor inhibited religion. It was held that the challenged legislation met this test because it had the secular purpose of furthering the educational opportunities available to the young by means of a general program to lend textbooks free of charge, and did not advance religion. In a statement significant to the problem before us, the court invoked what has come to be called the "child benefit" theory, i.e., it held that the financial benefit provided by the program was to the children and their parents rather than to the parochial schools, that no funds or books were furnished to the schools, and that ownership of the books remained "at least technically" in the state. Moreover, it held, while books, unlike buses, are critical to the teaching process, religious schools pursue both religious instruction and secular education, and the record did not support the proposition that textbooks on nonreligious subjects were used by the parochial schools to teach religion.

In subsequent decisions, the court introduced a third prong of the test prescribed in *Everson*: whether the program in question fosters an excessive government entanglement with religion. (*Lemon* v. *Kurtzman* (1971) 403 U.S. 602, 612-613 [29 L.Ed.2d 745, 755-756, 91 S.Ct. 2105]; *Walz* v. *Tax Commission* (1970) 397 U.S. 664, 668 [25 L.Ed.2d 697, 717-718, 90 S.Ct. 1409].)[5] It made clear also that a law which confers an indirect, remote and incidental benefit on religious institutions is not for that reason alone unconstitutional. (*Committee for Public Education* v. *Nyquist* (1973) 413 U.S. 756, 771 [37 L.Ed.2d 948, 962, 93 S.Ct. 2995].)

The foregoing precepts have been applied to uphold or strike down various aid programs to religious schools.

Direct aid to religious schools in the form of payment of all or part of the salaries of teachers for instruction in secular subjects, and supplying textbooks and instructional material confined to secular matters have been held unconstitutional as fostering an excessive entanglement of government with religion. (*Lemon* v. *Kurtzman, supra*, 403 U.S. 602, 607 et seq. [29 L.Ed.2d 745, 752 et seq.].) The loan of instructional

---

[5]There may be some question, however, whether a majority of the high court has embraced the "entanglement" aspect of the test. (See Note (1981) 94 Harv.L.Rev. 1127, 1128-1129.)

material such as maps, charts, and science laboratory equipment to religious schools is also prohibited on the ground that this would have the "unconstitutional primary effect of advancing religions because of the predominantly religious character of the schools benefiting" from the program. (*Meek* v. *Pittenger* (1975) 421 U.S. 349, 362-366 [44 L.Ed.2d 217, 230-232, 95 S.Ct. 1753].) Also held to be unconstitutional as a subsidy to the religious mission of parochial schools are direct money grants to repair and maintain facilities and equipment (*Committee for Public Education* v. *Nyquist, supra*, 413 U.S. 756, 774-780 [37 L.Ed.2d 948, 963-967]) and transportation and services for children on field trips to government, industrial, cultural and scientific centers (*Wolman* v. *Walter* (1977) 433 U.S. 229, 252-255 [53 L.Ed.2d 714, 735-737, 97 S.Ct. 2593]). Although grants to religious schools for preparation of state-mandated tests formulated by teachers of such schools are prohibited as an impermissible aid to religion (*Levitt* v. *Committee for Public Education* (1973) 413 U.S. 472, 479-482 [37 L.Ed.2d 736, 742-744, 93 S.Ct. 2814]), where tests are prepared and scored by the public school authorities, they may be supplied to the religious schools by the state without violating the Constitution (*Wolman* at pp. 238-240 [53 L.Ed.2d at pp. 726-728]).

Various forms of aid provided by statutes which declare that the aid is granted to the child in a nonpublic school or his parents have been upheld. Loans of textbooks to nonpublic school children were held to be valid following *Allen* in *Wolman* v. *Walter, supra*, 433 U.S. 229, 236-238 [53 L.Ed.2d 714, 725-726] and *Meek* v. *Pittenger, supra*, 421 U.S. 349, 359-362 [44 L.Ed.2d 217, 228-230]. Also held constitutional was a statute providing for therapeutic, guidance and remedial services to nonpublic school students, furnished by public employees off the premises of the religious school. (*Wolmann* at pp. 244-248 [53 L.Ed.2d at pp. 729-732].) However, a statute authorizing the provision of similar services by public employees on religious school premises was found to be unconstitutional because of the danger that it would result in the impermissible fostering of religion and an improper entanglement between church and state. (*Meek*, at pp. 367-372 [44 L.Ed.2d at pp. 233-236].)

As we have seen, *Meek* v. *Pittenger, supra*, 421 U.S. 349, 362-366 [44 L.Ed.2d 217, 230-232], held that the loan of secular instructional material such as maps and globes directly to religious schools violates the establishment clause because religion is so pervasive in such schools that this material, although secular in nature, would have the impermis-

sible primary effect of advancing religion. Following *Meek*, the Ohio Legislature passed a measure authorizing the loan of similar secular instructional material to a student or his parents. The statute was held unconstitutional "[d]espite the technical change in legal bailee" on the same grounds as those stated in *Meek*, i.e., that because the teaching process in the religious schools was largely devoted to inculcation of religious beliefs and secular and religious education were inextricably intertwined, the loan of secular instructional material "had the primary effect of providing a direct and substantial advancement of the sectarian enterprise." (*Wolman* v. *Walter, supra,* 433 U.S. 229, 250 [53 L. Ed.2d 714, 733].)

Also held unconstitutional were a tuition reimbursement plan for parents whose children attended nonpublic school, and tax relief to parents who did not qualify for reimbursement. The court held that the religious mission of the schools would be advanced because the inevitable result of rendering such assistance to parents would be to provide financial support to the religious schools, thereby allowing the state to do indirectly what it could not do directly. (*Committee for Public Education* v. *Nyquist, supra,* 413 U.S. 756, 780-794 [37 L.Ed.2d 948, 967-975].)

We consider next the cases interpreting our state constitutional provisions prohibiting aid to denominational schools. Two decisions are of greatest significance in resolving the issue before us.

The first, decided 11 months before *Everson*, is *Bowker* v. *Baker, supra,* 73 Cal.App.2d 653, in which the Court of Appeal upheld, under provisions of the California Constitution referred to above prohibiting aid to sectarian schools (see fns. 3 and 4, *ante*, p. 797),[6] the validity of a statute allowing nonpublic school students to be transported on public school buses free of charge. The public school students in the Porterville School District did not fill the bus, and 17 parochial school pupils were permitted to use the empty seats. Neither the route nor the stops were changed to accommodate the parochial school students, and the only added expense to the public resulted from the de minimis cost resulting from the weight added to the bus by the pupils who attended the religious school. The court held that the purpose of the statute, to raise the standard of intelligence of youth and to provide for their safety, were

---

[6]At the time *Bowker* was decided the provision which now appears in article XVI, section 5 of our Constitution, was found in article IV, section 30.

legitimate objects of government, that the transportation of private school pupils served this end, that the direct benefit of the statute flowed to the children, and that the religious schools derived only an incidental benefit from the free transportation of their pupils.

The *Bowker* court compared the transportation of parochial school children to other government services provided to denominational schools and institutions: "When we consider the complexities of our modern life we realize that many expenditures of public money give indirect and incidental benefit to denominational schools and institutions of higher learnings. Sidewalks, streets, roads, highways, sewers are furnished for the use of all citizens regardless of religious belief. No one has yet challenged the right of any law abiding citizen to travel to a school over a highway built with public funds because of his religious beliefs or because he is attending a denominational institution, yet ... without roads over which pupils could reach the school there would be no school. Police and fire departments give the same protection to denominational institutions that they give to privately owned property and their expenses are paid from public funds. If St. Anne's Parochial School caught fire would the plaintiff argue that the Porterville fire department responding to the call should stand by idle until the flames spread to privately owned buildings before attempting to extinguish the conflagration because the cost of the firefighting equipment and the salaries of the firemen are paid by funds raised by general taxation?" (73 Cal.App.2d at p. 666.)

The second case of significance is *California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593 [116 Cal.Rptr. 361, 526 P.2d 513]. In that case, we considered the constitutionality of the California Education Facilities Authority Act (§ 94100 et seq.)[7] which created a public agency authorized to issue tax-exempt bonds, the proceeds of which would be used to provide institutions of higher education with the means to finance construction of facilities. These could be marketed at a lower rate than bonds issued by nonexempt bodies, thereby reducing the cost of financing the projects built or acquired with the proceeds. The bonds were the obligation of the agency and were not a debt of the state or a pledge of the state's credit, and administrative costs of the agency were borne by the participating colleges.[8]

---

[7]At the time of the *Priest* decision, the act appeared in section 30301 et seq.

[8]The statute excepts from its provisions any facilities used for sectarian instruction or as a place of religious worship, any facility to be used in connection with a school or

After deciding that the measure did not violate the establishment clause of the United States Constitution,[9] we held it to be valid under article IX, section 8 of the California Constitution because it did not call for the outlay of public money by grant or loan, reimbursement for expenditures made by a private school, or commitment of the state's credit.[10]

We ruled also, citing *Bowker*, that the statute was valid under then article XII, section 24 (now replaced by art. XVI, § 5). We reasoned that, although this provision "bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes...." (12 Cal.3d at p. 605, fn. 12), it does not prohibit a religious institution from receiving an indirect, remote, or incidental benefit from a statute which has a secular primary purpose. The state's interest in promoting education represented such a purpose. Moreover, the measure did not have the effect of supporting religious activity because its benefits were granted to sectarian and nonsectarian colleges on an equal basis; and all aid for religious projects was prohibited. The statute limited aid to colleges which did not restrict entry on religious grounds or require religious instruction, and no financial burden was imposed on the state. We concluded with the observation that, although the statute appeared "in certain subtle respects ... to approach state involvement with religion [citation], we cannot say that in the abstract it crosses the forbidden line." (*Id.* at p. 606.)[11]

---

department of divinity, and colleges which restrict entry on racial or religious grounds or require students to receive instruction in the tenets of a particular religious faith. (§ 94110.)

[9]Our decision measured the statute against the three-prong test described above, and concluded that the act had a clearly secular legislative purpose, that its primary effect neither advanced nor inhibited religion, and did not foster an excessive government entanglement with religion. We relied substantially on a decision of the United States Supreme Court (*Hunt v. McNair* (1973) 413 U.S. 734 [37 L.Ed.2d 293, 93 S.Ct. 2868]), upholding a substantially identical South Carolina statute. (12 Cal.3d at pp. 600-603.)

[10]*Priest* involved a private university not affiliated with any religious denomination. In dictum, however, we did not so limit our opinion. (12 Cal.3d at p. 598, fn. 5.)

[11]Other cases relied upon by the parties are only peripherally relevant. For example, in *Board of Trustees* v. *Cory* (1978) 79 Cal.App.3d 661 [145 Cal.Rptr. 136], the court invalidated a statute providing for payments to private medical schools to increase student enrollment. It held that the measure violated the provisions of article IX, section 8 of the Constitution because it authorized a payment to a school not under the direction of the public school authorities. In dictum, the appellate court declared that if tuition were paid to the students rather than the schools or to the schools on behalf of the students, the benefit to the school would be incidental to the direct benefit to the student, and therefore the measure would be constitutional.

In arguing their respective positions, the parties focus on the propriety of the "child benefit" theory and its concomitant principle, that an indirect, remote, or incidental benefit to a religious school does not violate the provisions of the California Constitution. As we have seen, the trial court found that section 60315 does not authorize the expenditure of public money for the direct benefit of sectarian schools and that any benefit to such schools from the textbook loan program, although substantial, is only indirect and incidental.

The "child benefit" theory has been criticized by courts and commentators on the ground that it proves too much. (See, e.g., *Bloom* v. *School Committee of Springfield* (1978) 376 Mass. 35 [379 N.E.2d 578, 582-583]; *Dickman* v. *School District No. 62c, Oregon City* (1961) 232 Ore. 238 [366 P.2d 533, 539-540, 93 A.L.R.2d 969]; *McDonald* v. *School Bd. of Yankton, etc.* (1976) 90 S.D. 599 [246 N.W. 2d 93, 98]; Cushman, *Public Support of Religious Education* (1950) 45 Ill.L.Rev. 333, 347-348, Choper, *The Establishment Clause and Aid to Parochial Schools* (1968) 56 Cal.L.Rev. 260, 313; Note (1967) 36 Geo.Wash.L.Rev. 246, 248; Note (1947) 60 Harv.L.Rev. 793, 799-800.) If the fact that a child is aided by an expenditure of public money insulates a statute from challenge, constitutional proscriptions on state aid to sectarian schools would be virtually eradicated. "'There is no logical stopping point.'" (Choper, *Aid to Parochial Schools, supra*, 56 Cal.L.Rev. 260, 313.) The doctrine may be used to justify any type of aid to sectarian schools because, as was stated in *Gurney* v. *Ferguson* (1941) 190 Okla. 254 [122 P.2d 1002, 1003], "practically every proper expenditure for school purposes aids the child."

The dissonant decisions of the United States Supreme Court applying the "child benefit" principle illustrate the problem. For example, the court has upheld under the First Amendment textbook loan programs to students because "the financial benefit is to parents and children and not to schools," ownership of the books remains "at least technically" in the state, and secular and religious training are not "so intertwined that secular textbooks furnished to students by the public are in fact instrumental in the teaching of religion." (*Board of Education* v. *Allen, supra*, 392 U.S. 236, at pp. 244, 248 [20 L.Ed.2d 1060, at pp. 1066, 1068]; *Meek* v. *Pittenger, supra*, 421 U.S. 349, 359-362 [44 L.Ed.2d 217, 228-230]; *Wolman* v. *Walter, supra*, 433 U.S. 229, 236-238 [53 L.Ed.2d 714, 725-726].) Nevertheless, the loan of secular instructional material such as maps, globes, and weather forecasting charts to students is said to have the inescapable primary effect of providing direct

substantial aid to the sectarian school because it is impossible to separate the secular educational function from the sectarian, so that state aid "inevitably flows in part in support of the religious role of the schools." (*Wolman*, at pp. 248-251 [53 L.Ed.2d at pp. 732-734].) We are unable to harmonize the holdings of these cases.[12] (Comment (1977) 63 Iowa L.Rev. 543; Note (1978) 5 Pepperdine L.Rev. 573-583.)

---

[12] *Wolman* relied on the reasoning of *Meek*. Although, as we have seen, *Meek* involved the loan of secular instructional material directly to sectarian schools, *Wolman* held that *the same principles applied* because "it would exalt form over substance if this distinction were found to justify a result different from that in *Meek*." (433 U.S. at p. 250 [53 L.Ed.2d at pp. 733-734].) In *Meek*, the court justified its holding that the loan of these materials to the school was unconstitutional in the following language: "... we agree with the appellants that the direct loan of instructional material and equipment has the unconstitutional primary effect of advancing religion because of the predominantly religious character of the schools benefiting from the Act .... [A] school would not be barred from receiving loans of instructional material and equipment even though its dominant purpose was the inculcation of religious values, even if it imposed religious restrictions on admissions or on faculty appointments, and even if it required attendance at classes in theology or at religious services....

"It is, of course, true that as part of general legislation made available to all students, a State may include church-related schools in programs providing bus transportation, school lunches, and public health facilities—secular and nonideological services unrelated to the primary, religion-oriented educational function of the sectarian school. The indirect and incidental benefits to church-related schools from those programs do not offend the constitutional prohibition against establishment of religion.... But the massive aid provided the church-related nonpublic schools of Pennsylvania by Act 195 is neither indirect nor incidental.

"For the 1972-1973 school year the Commonwealth authorized just under $12 million of direct aid to the predominantly church-related nonpublic schools of Pennsylvania through the loan of instructional material and equipment pursuant to Act 195. To be sure, the material and equipment that are the subjects of the loan—maps, charts, and laboratory equipment, for example—are 'self-polic[ing], in that starting as secular, nonideological and neutral, they will not change in use.' ... But faced with the substantial amounts of direct support authorized by Act 195, it would simply ignore reality to attempt to separate secular educational functions from the predominantly religious role performed by many of Pennsylvania's church-related elementary and secondary schools and to then characterize Act 195 as channeling aid to the secular without providing direct aid to the sectarian. Even though earmarked for secular purposes, 'when it flows to an institution in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission,' state aid has the impermissible primary effect of advancing religion ....

"The church-related elementary and secondary schools that are the primary beneficiaries of Act 195's instructional material and equipment loans typify such religion-pervasive institutions. The very purpose of many of those schools is to provide an integrated secular and religious education; the teaching process is, to a large extent, devoted to the inculcation of religious values and belief. See *Lemon v. Kurtzman*, 403 U.S. at 616-617. Substantial aid to the educational function of such schools, accordingly, necessarily results in aid to the sectarian school enterprise as a whole. '[T]he secular education those schools provide goes hand in hand with the religious mission that is the *only reason* for the schools' existence. Within the institution, the two are inextricably

Also, in *Wolman*, the court invalidated a statute providing state financing of field trips to secular locations by parochial school students on the ground that the timing and frequency of the trips was determined by the schools, and that the benefit was therefore to the school rather than to the child. Another defect found in the statute was that the teachers of the parochial schools interpreted the experience for the students, and "where the teacher works within and for a sectarian institution, an unacceptable risk of fostering of religion is an inevitable byproduct." (433 U.S. at p. 254 [53 L.Ed.2d at p. 736].) It is difficult to understand why this rationale does not apply with equal force to textbooks, which are selected and interpreted by the authorities and teachers of the religious school.

The high court itself has implied that its decisions on the subject cannot be reconciled. The court has acknowledged that in both *Meek* and *Wolman* there is a "tension" between its holding prohibiting the loan of instructional material and the textbooks cases, but held that it chose to refrain from extending the "presumption of neutrality"—i.e., that the material would not be used for religious purposes—to material other than textbooks. (*Wolman* v. *Walter, supra*, 433 U.S. 229, fn. 18 at pp. 251-252 [53 L.Ed.2d 714, at pp. 734-735].)

It seems clear to us that in most instances the "child benefit" doctrine leads to results which are logically indefensible. In any event, the concept is not relevant in this case, for in our view the textbook loan program authorized by section 60315 does not qualify under the "child benefit" theory because it cannot be characterized as providing sectarian schools with only indirect, remote, and incidental benefits.

In assessing the validity of the program we consider first, whether it only indirectly benefits parochial schools, and second, the character of the benefit conferred by the program.

Although section 60315 provides that the books are to be loaned to students—as distinguished from loans to the schools themselves which

intertwined.' *Id.*, at 657 (opinion of Brennan, J.).... For this reason, Act 195's direct aid to Pennsylvania's predominantly church-related, nonpublic elementary and secondary schools, even though ostensibly limited to wholly neutral, secular instructional material and equipment, inescapably results in the direct and substantial advancement of religious activity, cf. *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U.S., at 781-783, and n. 39, and thus constitutes an impermissible establishment of religion." (421 U.S. 349 at pp. 363-366 [44 L.Ed.2d at pp. 230-232].)

would undoubtedly be found to violate the establishment clause[13]—it is the schools which specify the names of the books requested from the state, receive and store the books, and pass them on to successive groups of students until the books are worn out or obsolete. Except for the fact that the parents sign a request form for the books, the procedure in all significant respects is identical to that followed by public schools.

We are persuaded by Justice Brennan who, in his dissent in *Meek* v. *Pittenger, supra*, 421 U.S. 349, 379 [44 L.Ed.2d 217, 240], called it "pure fantasy" to treat the textbook loan program, similar to the one involved in this case, as a loan to students. He stated, "The whole business is handled by the schools and public authorities, and neither parents nor students have a say .... [T]he nonpublic school, not its pupils, is the motivating force behind the textbook loan, and ... virtually the entire loan transaction is to be, and is in fact, conducted between officials of the nonpublic school, on the one hand, and officers of the State, on the other." (421 U.S. at pp. 379-380 [44 L.Ed.2d at p. 240].)

More important than these procedural considerations, however, is the inseparability of the benefit to the pupil and the school, and the impossibility of characterizing the advantage to one as remote and to the other as direct. The books are supplied for use in the school, and we are unable to perceive any significant distinction from a constitutional standpoint whether they are loaned to the students for use in the school, or to the school for use by the students. In either circumstance, both the child and the school benefit. The United States Supreme Court has recognized as much in characterizing textbook loan programs as a form of financial assistance to the school even though the loan is nominally made to the student.[14] There is no rational reason for concluding that the school benefits only indirectly or remotely from the loan if the child is the nominal recipient, for it is an undeniable fact that books are a critical element in enabling the school to carry out its essential mission to teach the students.

---

[13]The state may not reimburse sectarian schools for textbooks (*Lemon* v. *Kurtzman, supra*, 403 U.S. 602, 613 et seq. [29 L.Ed.2d 745, 755 et seq.]), nor may it lend secular instructional material to a sectarian school (*Meek* v. *Pittenger, supra*, 421 U.S. 349, 362-366 [44 L.Ed.2d 217, 230-232]).

[14]In *Norwood* v. *Harrison* (1973) 413 U.S. 455 [37 L.Ed.2d 723, 93 S.Ct. 2804], the high court invalidated a program to lend textbooks to students in public and private schools without regard to whether a private school had racially discriminatory policies. The court stated, "Free textbooks, like tuition grants directed to private school stu-

We agree with the observation in *Gaffney* v. *State Department of Education* (1974) 192 Neb. 358 [220 N.W.2d 550, 556], that the application of the "child benefit" theory in this circumstance "ignores substance for form, reality for rhetoric, and would lead to total circumvention of the principles of our Constitution." Nebraska's provisions are virtually identical to section 5 of article XVI of the California Constitution.

The conclusion that the benefit to religious schools provided by section 60315 is neither indirect nor remote does not end our inquiry, however, for not all public expenditures directly for the benefit of sectarian schools are prohibited (e.g., providing fire protection), and not all expenditures for the immediate benefit of children are valid (e.g., reimbursement for the purchase of religious articles by students in public and nonpublic schools). The question still remains whether the character of the benefit provided by the textbook loan program results in the "support of any sectarian . . . school. . . ."

The authorities are virtually unanimous in characterizing textbooks as having a central place in the educational mission of a school. They have been called "a basic educational tool"; (*Norwood* v. *Harrison, supra*, 413 U.S. 455, 465 [37 L.Ed.2d 723, 731]); it has been said that they go "to the very heart of education in a parochial school" (Justice Douglas, dis. in *Allen*, 392 U.S. 236 at p. 257 [20 L.Ed.2d 1060, 1073]); and "are the most essential tool of education since they contain the resources of knowledge which the educational process is designed to exploit" (Justice Black, dis. in *Allen*, at p. 252 [20 L.Ed.2d at p. 1071]).

By providing textbooks at public expense, the loan program appropriates money to advance the educational function of the school. In this respect the program is distinguishable from "generalized services government might provide to schools in common with others" (*Norwood* v. *Harrison, supra*, 413 U.S. 455, 465 [37 L.Ed.2d 723, 731]), such as

dents, are a form of financial assistance inuring to the benefit of the private schools themselves. An inescapable educational cost for students in both public and private schools is the expense of providing all necessary learning materials. When, as here, that necessary expense is borne by the State, the economic consequence is to give aid to the enterprise. . . ." (413 U.S. at pp. 463-464 [37 L.Ed.2d at pp. 730-731].) The court held that the principles set forth in *Allen* were not violated because in that case the direct financial benefit was to parents and children and the school received only an indirect benefit, whereas even indirect aid to racially discriminatory schools is unconstitutional.

fire and police protection, the maintenance of roads and sidewalks, and similar public services. These services, unlike education, have no doctrinal content, and they do not advance the essential objective of the sectarian school, which is the education of the child. *Everson* itself recognized this distinction, for it referred to services to parochial schools such as fire and police protection as "indisputably marked off from the religious function." (330 U.S. 1, 18 [91 L.Ed. 711, 724].)

We decline to follow the rationale of *Allen* that a textbook loan program may be justified on the ground it should not be assumed that the parochial schools in which the books are used will employ the secular texts to teach religion. This reasoning appears to us to be inconsistent with several of the cases decided by the high court subsequent to *Allen,* cited above, which hold that secular instructional material furnished to religious schools promotes their religious mission. Since we reject the application of the "child benefit" principle upon which *Allen* is based, it follows we cannot agree that a benefit to the school in the form of a loan of textbooks is justified because the books will be used only for secular instruction.

In any event, it is not the meaning of the First Amendment which is critical to our determination, but section 8 of article IX and section 5 of article XVI of the California Constitution. Those provisions do not confine their prohibition against financing sectarian schools in whole or in part to support for their religious teaching function, as distinguished from secular instruction.

Jurisdictions with similar constitutional provisions also refuse to make such a distinction. (See, e.g., *Gaffney* v. *State Department of Education, supra,* 220 N.W.2d 550, 556; *Dickman* v. *School District No. 62C, Oregon City, supra,* 366 P.2d 533, 540-542.)[15]

---

[15]The Supreme Court of Nebraska in *Gaffney* summarized the role of the secular textbook in the religious school as follows: "[T]he court must examine the character of the aided activity rather than the manner or the form in which aid is given. We point out further that one of the main purposes of the parent sending his child to a parochial school is to insure the early inculcation of religion. Assuming that textbooks promote the notion of an absolutely neutral and equal secular educational program, the reimbursement or the loan of textbooks to the students is for the purpose of augmenting the public school secular education with religious training. The state, by aiding the parents and the students by textbooks, secular though they may be, is providing a program for aiding the church and in advancing religious education. It is clear to us that the fact that the benefit of the secular textbooks goes originally to the student rather than directly to the school is a mere conduit and does not have the cleansing effect of

We conclude that section 60315 is unconstitutional because it violates section 8 of article IX and section 5 of article XVI of the California Constitution by appropriating funds for the support of sectarian schools.[16]

In view of this conclusion, it is unnecessary to consider other issues raised by the parties. Nor are we required to decide the question raised in the second action, i.e., whether the textbook loan program is unconstitutionally administered.

The judgments are reversed.

Bird, C. J., Tobriner, J., Richardson, J., Newman, J., Staniforth, J.,* and Wiener, J.,* concurred.

---

removing the identity of the ultimate benefit to the school as being public funds." (220 N.W.2d 550, 557.)

In concluding that the textbook loan program violated the Nebraska Constitution, which has a virtually identical provision to section 5 of article XVI of the California Constitution, the court stated: "It seems to us that to state the constitutional provision is to answer our question. By its terms the provisions furnish aid (in the form of textbooks) to private sectarian schools. By its terms the cost is paid by a public appropriation of tax funds. By its terms textbooks must be used and are given in aid of students in educational institutions which are not exclusively owned and controlled by the state, or a governmental subdivision thereof." (*Id.* at p. 553.)

[16]We need not consider whether *Priest* and *Bowker* were correctly decided. *Bowker*, unlike the present case, did not involve assistance to the educational function of parochial schools in the sense that textbooks aid that objective. Moreover, *Bowker*, like *Everson*, reasoned that bus transportation is analogous to the provision of generalized governmental services such as police and fire protection, which are granted to parochial schools in common with others, a rationale which is inapplicable to the textbook loan program.

Also distinguishable is *Priest*. The statute considered in that case provided assistance to students at the college level (see *Tilton v. Richardson* (1976) 403 U.S. 672, 687 [29 L.Ed.2d 790, 804, 91 S.Ct. 2091]), its benefits were restricted to colleges which did not require students to receive religious instruction, and it did not involve the expenditure of public funds for the support of sectarian schools.

*Assigned by the Chairperson of the Judicial Council.