CHRISTIAN SCIENCE READING ROOM JOINTLY MAINTAINED, a California non-profit religious corporation, and David M. Sacks, Plaintiffs-Appellees,

v.

CITY AND COUNTY OF SAN FRANCISCO, a municipal corporation; Airports Commission of the City and County of San Francisco; Morris Bernstein, J. Edward Fleishell, Ruth E. Kadish, Z.L. Goosby, and William K. Coblentz as members of the Airports Commission of the City and County of San Francisco; and Louis A. Turpen, as Director of Airports of the City and County of San Francisco, Defendants-Appellants.

Nos. 84–2076, 84–2415.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 11, 1985.

Decided March 14, 1986.

Richard E. Levine, Fenwick, Stone, Davis & West, Palo Alto, Cal., for plaintiffs-appellees.

Diane L. Herman, Dist. Co. Atty., San Francisco, Cal., for defendants-appellants.

Before SKOPIL, REINHARDT, and HALL, Circuit Judges.

REINHARDT, Circuit Judge:

### INTRODUCTION

The issue in the case before us is whether the decision of the San Francisco Airports Commission to terminate the tenancy of the Christian Science Reading Room Jointly Maintained because it is a religious organization can stand constitutional muster. The Airport acted in the belief that the provisions of the United States and California Constitutions affecting the establishment of religion required it to evict its longtime tenant. We conclude that the Airport was wrong in that belief and that its attempt to terminate the Reading

Room's tenancy violated the Equal Protection Clause of the United States Constitution. We also affirm certain post-judgment orders entered by the district court.

## I. BACKGROUND

Since 1956 the Christian Science Reading Room Jointly Maintained has been a tenant in one of the terminal buildings at San Francisco International Airport which is operated by the appellants (collectively referred to as the Airport). In the space it rents, it has operated a reading room used for meditation and reading of Christian Science texts; reading materials are also offered for sale. Since 1976 the Reading Room has occupied the space under a rental permit.

On April 13, 1981, the Director of Airports sent a letter to the Reading Room stating that its "month-to-month tenancy must be terminated forthwith" because the Reading Room's "continued occupancy of Airport space [would be] contrary to provisions of the California Constitution." Attached to the letter was a supporting opinion of the Airports General Counsel that relied on article I, section 4 and article XVI, section 5 of the California Constitution, both of which prohibit state support of religion. (For purposes of convenience, we sometimes refer to both provisions collectively as the Establishment Clause of the California Constitution.) No further steps were taken at that time, however, and the Reading Room remained a tenant.

On January 10, 1984, the Director of Airports sent another letter to the Reading Room, stating that it was the Airport's current policy not to issue leases or permits for rental space to religious organizations. The Director stated further that "[t]his position is based in part on legal issues which were brought to our attention in 1981" by the Airports General Counsel. The Reading Room was directed to vacate its space permanently when renovation of the terminal building began.

On March 21, 1984, the Director of Airports sent a third letter to the Reading Room, in which he said that the renovation of the terminal building was underway and the time had come for the Reading Room to leave the premises. The requisite thirty-day notice to vacate was given, and the Reading Room was informed that the Airport would not rent it any other space.

On April 3, 1984, an attorney for the Reading Room appeared at a meeting of the Airports Commission and sought to have the Commission revoke the eviction letter. The Commission's concerns regarding the Establishment Clause of the First Amendment of the United States Constitution were discussed. Subsequently, the Reading Room's attorney supplied the Commission with a lengthy brief on the constitutional question. On April 17, the Airports Commission met again, and after further discussion of the requirements of the First Amendment, finally refused to revoke the eviction letter. The Commission also adopted a formal policy statement that the Airport would not rent space to religious organizations. The policy had apparently existed informally since 1981, or possibly even since 1977.

On April 19, the Reading Room filed in federal district court an application for a temporary restraining order and a complaint for a permanent injunction seeking to prohibit the Airport from evicting it. The temporary restraining order was granted on April 20. On May 8, after a trial, the district court granted a permanent injunction and entered judgment for the Reading Room. The permanent injunction declared that the eviction notice of March 21, 1984 was void, and ordered the Airport to allow the Reading Room to rent "comparable rental space and on comparable terms, conditions and covenants as existed at the time [the] action was commenced." Under the court's order, the Airport was permitted to terminate the Reading Room's tenancy at a later date as long as it was done for a "valid, nondiscriminatory reason."

As of May 16, 1984, the parties were unable to agree on what substitute space would be rented to the Reading Room, and the Airport sent it another thirty-day evic-

tion notice. On June 6, the Airport filed an appeal from the permanent injunction and judgment. On June 18, the Reading Room had not vacated the premises and the Airport began an unlawful detainer action in the Superior Court of California, County of San Mateo. On June 19, the Reading Room requested that the district court stay the state court proceedings and hold the Airport in civil contempt. On June 21, a temporary restraining order was issued, barring the Airport from proceeding any further with the state court litigation.

On July 3, the district court stayed the state court litigation until otherwise ordered, and orally ordered the parties to cooperate and to negotiate the issue of what space could be rented. The Airport was further orally ordered to disclose all potential rental locations to the Reading Room.

On July 23, the district court again orally ordered the parties to negotiate and ordered the Reading Room to vacate the premises it was occupying. On July 30, the parties informed the court that a settlement had been reached. The Reading Room withdrew its contempt motion and the Airport stated that it would dismiss the state court action. The Airport agreed to rent space to the Reading Room, but both parties stipulated that the rental was made only "in accordance with [the district] court's orders." The district court orally approved this settlement.

On August 28, the Airport appealed from these post-judgment orders. On September 11, the district court entered a written order detailing and approving the settlement, and vacating the stay of the state court litigation. On September 17, the Airport amended its notice of appeal to make it clear that the Airport was appealing from the oral orders of July 3, 23, and 30, 1984, as embodied in the written order of September 11, 1984.

We review the district court's grant of injunctive relief for an abuse of discretion or for application of an erroneous legal standard. *S.E.C. v. Goldfield Deep Mines Co.*, 758 F.2d 459, 465 (9th Cir.1985).

Questions of law, including those relating to the meaning of constitutional provisions, are considered *de novo*. *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.) (en banc), *cert. denied*, — U.S. ——, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Findings of fact are reviewed under the "clearly erroneous" standard of review. *Id.* at 1200; Fed.R.Civ.P. 52(a). We may affirm a judgment on any basis supported by the record, even if the district court did not rely on that basis. *United States v. County of Humboldt*, 628 F.2d 549, 551 (9th Cir.1980).

## II. EQUAL PROTECTION: THE RATIONAL RELATIONSHIP TEST

The district court ruled that religions *taken as a whole* constitute a suspect class and that, because the Airport presented no compelling governmental interest in support of its new policy of refusing to rent to religious organizations, the policy violated the Equal Protection Clause of the Fourteenth Amendment. The district court applied the strict scrutiny test and enjoined the Airport from evicting the Reading Room pursuant to that policy. We reach the same result, but by applying a different level of scrutiny to the Airport's actions.

The Airport's policy divides the set of all current and prospective Airport tenants into two classes: religious organizations and all others. It seems clear that an individual religion meets the requirements for treatment as a suspect class. *See, e.g., New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516–17, 49 L.Ed.2d 511 (1976) (religion is an inherently suspect classification) (dicta); *De la Cruz v. Tormey*, 582 F.2d 45, 49 (9th Cir.1978) (religion is an "improper bas[is] for differentiation") (dicta), *cert. denied*, 441 U.S. 965, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979); *see also City of Cleburne v. Cleburne Living Center*, 105 S.Ct. 3249, 3254–55 (1985) (describing test for determining whether a particular classification scheme creates a suspect class); *Plyler v. Doe*, 457 U.S. 202, 216 n. 14, 102 S.Ct. 2382, 2394 n. 14, 72 L.Ed.2d 786 (1982) (same). Whether all religions

together constitute a suspect class for purposes of the Equal Protection Clause is a far more complex question that the courts have not previously addressed. We need not attempt to resolve that question here, however, because, as we conclude *infra*, the Airport's actions do not even meet the rational relationship test, the lower standard that applies when the class affected is *not* a suspect one.[1]

Under the rational relationship test, a classification will be upheld if it rationally furthers a legitimate state purpose. *See Hooper v. Bernalillo County Assessor*, — U.S. —, 105 S.Ct. 2862, 2866, 86 L.Ed.2d 487 (1985); *Zobel v. Williams*, 457 U.S. 55, 60 (1982). In determining whether the Airport's new policy meets that test, we must first determine the policy's purpose.

## III.  PURPOSE OF THE AIRPORT'S POLICY

The Airport has argued that there are three possible purposes for its policy of not renting to religious organizations: first, compliance with its obligations under the Establishment Clauses of the United States and California Constitutions; second, maximization of Airport revenue; third, serving the desires of the traveling public.

We are not bound by the purposes counsel advances when it is clear that they were not the actual purposes of the governmental policy. *See Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 & n. 16, 95 S.Ct. 1225, 1233 & n. 16, 43 L.Ed.2d 514 (1975). The district court found that the sole purpose of the Airport's policy of excluding religious organizations was to correct "violat[ions] [of] the Establishment Clause of the First Amendment to the Constitution." The record fully supports this conclusion, with only one exception. The district court

erred to the extent that it found that only the United States Constitution, and not the California Constitution, was involved. The two other purposes advanced by counsel were patently make-weight. The letters of April 13, 1981, January 10, 1984, and March 21, 1984, as well as the discussions at the Airports Commission meetings of April 3 and 17, 1984, are dispositive in this regard. We do not suggest that revenue considerations could not constitute a legitimate basis for determining what entities are entitled to rent Airport space. We merely conclude that, here, it is evident that "maximizing revenue" was not the actual reason for the adoption of the new policy. In short, it is clear that the Airport believed that (1) the Establishment Clauses of both the United States and California Constitutions prohibited it from renting space to religious organizations and (2) it was required to adopt the new policy in order to remedy existing violations of those constitutions.

The purpose of remedying violations of the state and federal constitutions is clearly a legitimate one. Thus we must now determine whether the classification of prospective tenants into two groups, religious organizations and all others, rationally furthers that purpose.

## IV.  RATIONAL RELATIONSHIP OF AIRPORT'S CLASSIFICATION TO PURPOSE

In determining whether the classification rationally furthers the Airport's purpose of remedying constitutional violations, we must first examine the effect of the Establishment Clauses of the United States and California Constitutions on the Airport's right to rent space. Specifically, the question is: did the Airport's prior policy of renting space to religious groups and, par-

---

**1.**  The Reading Room argues that the Free Exercise Clause of the First Amendment provides an alternative basis for applying strict scrutiny. Because we resolve this case in the Reading Room's favor under the rational relationship standard, we need not consider the Free Exercise Clause, either as a basis for applying strict scrutiny under the Equal Protection Clause or

as an independent basis for invalidating the Airport's policy. For the same reason, we need not decide whether the policy of placing religious organizations in a separate category from all other entities would warrant application of the intermediate test set forth in *Plyler v. Doe*, 457 U.S. 202, 217–18, 102 S.Ct. 2382, 2395, 72 L.Ed.2d 786 (1982).

ticularly, its rental of space to the Reading Room, violate the provisions of either constitution? If not, there were no constitutional violations to remedy, and the classifications of religious and non-religious entities could not, under any state of facts, serve to further the objective of remedying such violations. *See United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 174–76, 101 S.Ct. 453, 459–60, 66 L.Ed.2d 368 (1980) (setting forth applicable test).

### A. *The United States Constitution*

The First Amendment to the United States Constitution provides in pertinent part that "Congress shall make no law respecting an establishment of religion." This provision is made applicable to the states through the Fourteenth Amendment. *Wallace v. Jaffree,* —— U.S. ——, 105 S.Ct. 2479, 2486–89, 86 L.Ed.2d 29 (1985). The Supreme Court has established a three-part test to determine whether governmental action is in compliance with the Establishment Clause. First, the action must have a secular governmental purpose. Second, the principal or primary effect of the action must be one that neither advances nor inhibits religion. Third, the action must not foster an excessive entanglement with religion. *Witters v. Washington Department of Services for the Blind,* —— U.S. ——, 106 S.Ct. 748, 751, 88 L.Ed.2d 846 (1986) (quoting *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971)); *School District of Grand Rapids v. Ball,* —— U.S. ——, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985); *Wallace,* 105 S.Ct. at 2489–90; *Estate of Thornton v. Caldor, Inc.,* —— U.S. ——, 105 S.Ct. 2914, 2917, 86 L.Ed.2d 557 (1985).

It appears that the purpose of the Airport's prior policy allowing religious groups to rent space was purely secular: to obtain revenue. The Reading Room's rental permit agreement was the standard form agreement that the Airport used for all tenants that rented under a permit. The rent the Reading Room paid was determined by a rent schedule that applied to all such tenants. Given the arm's-length nature of the commercial real estate transaction, and the absence of any evidence suggesting that the Airport was motivated by any other considerations, it is simply not possible to say that the Airport's "actual purpose" was to advance religion in general or the Christian Science religion in particular. *See Wallace,* 105 S.Ct. at 2490.

Nor can we say that the effect of the Airport's prior policy was to advance religion. It is, of course, obvious that the Christian Science Reading Room does receive some benefit from being allowed to rent space at the Airport. The Supreme Court has held however that the benefits to religion are improper only if they are other than "incidental." *Widmar v. Vincent,* 454 U.S. 263, 273–74, 102 S.Ct. 269, 276–77, 70 L.Ed.2d 440 (1981). Two factors have been held to be particularly relevant in determining whether benefits received are incidental: first, there must not be "any imprimatur of state approval on religious sects or practices," and second, the benefits must be generally available to others besides religious groups. *Id.* at 274, 102 S.Ct. at 276–77.

In this case, there is nothing to suggest that the Airport endorsed the religious views and beliefs of the Reading Room or gave favored status to religion in general. First, the San Francisco airport, like other airports, but unlike most other government buildings, is a facility in which commercial space has traditionally been available to those who wish to rent it. In many respects, it operates in a manner similar to that of a shopping mall. An airport does not symbolize or represent governmental authority in the minds of most citizens in the way that a city hall does, or a courthouse, or the Treasury, Defense, or Agriculture Departments. Moreover, there is no suggestion that all religions did not have the same opportunity to rent space, or that groups with views opposed to organized religion, or with any other social or philosophical view, were denied that opportunity. If the Airport endorsed the tenets of Christian Science by renting space to the Reading Room, then it could as easily be

argued that it is endorsing the business and labor practices of domestic airlines, the politics and policies of the foreign governments that own airlines, the consumption of alcohol and sourdough bread, and the reading of Penthouse magazine. Clearly, it does none of these. Second, the benefits of rental space at the Airport are generally available to all who wish to hawk their wares. The Airport is filled with restaurants, newsstands, florists, candy shops, gift shops, book stores, barbers, and duty free shops; it is not filled principally with religious organizations. *See Widmar*, 454 U.S. at 275, 102 S.Ct. at 277. Thus, we conclude that the prior policy of allowing religious organizations to rent Airport space did not improperly benefit, or advance, religion.

The final prong of the *Lemon* test deals with governmental entanglement with religion. In *Lemon*, the Supreme Court noted that the entanglement test was directed at "programs, whose very nature is apt to entangle the state in details of administration." *Lemon*, 403 U.S. at 615, 91 S.Ct. at 2112 (quoting *Walz v. Tax Commission*, 397 U.S. 664, 695, 90 S.Ct. 1409, 1425, 25 L.Ed.2d 697 (1970)). In this case, the Reading Room did not tell the Airport how to run its business, and the Airport did not tell the Reading Room how to run its operations. In fact, the Airport seems to have been significantly less involved in the operation of the Reading Room than is the case with respect to other tenants. In many instances, the Airport told its tenants what items of merchandise they were required to sell; the Airport never attempted, however, to prescribe the reading material to be maintained in the Reading Room.[2]

We conclude then that the Airport's policy of renting space to religious organizations meets all three of the *Lemon* criteria. Our conclusion is based on the particular facts of this case. We need not consider what the result might be if the Reading Room had been renting space in a more traditional government building, or in any other area that by its nature might suggest that the government endorsed the religious organization. We hold only that the Reading Room's rental of space at the Airport does not violate the Establishment Clause of the United States Constitution.

### B. *The California Constitution*

Article I, section 4 of the California Constitution provides that: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed.... The Legislature shall make no law respecting an establishment of religion." The courts of California have suggested that article I, section 4 is broader than the Establishment Clause of the First Amendment because of the additional language regarding "preference." *See Fox v. City of Los Angeles*, 22 Cal.3d 792, 796, 150 Cal.Rptr. 867, 869, 587 P.2d 663, 665 (1978); *Feminist Women's Health Center v. Philibosian*, 157 Cal. App.3d 1076, 1092, 203 Cal.Rptr. 918, 926 (1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985). It is irrelevant for our purposes whether this is so. We have already demonstrated above that the Airport's prior policy did not favor or prefer any individual religion, or religion as a whole. Accordingly that policy was not violative of article I, section 4 of the California Constitution.

The Airport also relies on Article XVI, section 5 of the California Constitution.[3]

---

**2.** The Airport attempts to argue that we must consider the issue of political entanglement as well as that of administrative entanglement. The claim of political entanglement is based on two newspaper articles which appeared in April, 1984 and which took opposite positions as to whether the Reading Room should be evicted. We note that there was no controversy during the period when the Airport had a policy of renting to religious organizations; the controversy arose well after the Airport changed to a policy of exclusion. Thus, the record contains

no facts which support a claim that the prior policy of renting to religious organizations caused any political entanglement.

**3.** Article XVI, section 5 provides in part that: Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any

That provision has been interpreted to "ban[ ] any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes." *California Teachers Association v. Riles*, 29 Cal.3d 794, 806, 176 Cal.Rptr. 300, 307, 632 P.2d 953, 960 (1981) (quoting *California Educational Facilities Authority v. Priest*, 12 Cal.3d 593, 605 n. 12, 116 Cal.Rptr. 361, 369 n. 12, 526 P.2d 513, 521 n. 12 (1974)). The clause, however, "does not prohibit a religious institution from receiving an indirect, remote or incidental benefit from a [policy] which has a secular primary purpose." *Riles*, 29 Cal.3d at 806, 176 Cal.Rptr. at 307, 632 P.2d at 960. As explained above, the Reading Room received only an indirect or incidental benefit from the Airport's rental policy, and the policy had a solely secular purpose. Furthermore, the Attorney General of California has held that it is proper under article XVI, section 5 for an airport to lease space in one of its buildings to a religious organization as long as the rental transaction is at arm's length. 25 Cal.Op. Att'y Gen. 309 (1955). Thus, we conclude that the Airport's policy of allowing religious organizations to rent space at the Airport did not violate article XVI, section 5 of the California Constitution.

### C. *The Rational Relationship Test Applied*

The purpose of the Airport's new policy was to remedy violations of certain provisions of the United States and California Constitutions and to bring its rental rules into compliance with those provisions. However, as we have just explained, the Airport's prior policy, including its rental of space to the Reading Room, already fully complied with the applicable provisions of both federal and state constitutions and there were no violations to remedy. Thus, the new policy that the Airport adopted did absolutely nothing to advance the Airport's purpose. A fortiori, the classification of

tenants into two groups, religious organizations and all others, did not rationally further that purpose. We must conclude, therefore, that the new policy fails the rational relationship test and violates the Equal Protection Clause of the Fourteenth Amendment. The Reading Room cannot be evicted pursuant to that policy.

We do not decide whether a policy barring rental of airport space to religious groups could be adopted for other reasons. We do not even preclude the possibility that such a policy might under some circumstances, constitute a legitimate way of ensuring compliance with the United States and California Constitutions. We hold only that where the Airport adopted its new policy in order to remedy violations of the United States and California constitutions that it thought existed, but in fact there were no violations to be remedied, it cannot be said that the policy (or its classifications) furthers the governmental purpose in any way. While our decision is necessarily a narrow one, we believe the distinctions we have drawn to be of considerable significance. Based on the record before us, it is far from clear that the Airport would have adopted its new policy but for its mistaken view that it was compelled by law to do so. We have no way of knowing what policy the Airport would have adopted had it had a proper understanding of the meaning and effect of the constitutional provisions. Unless and until the Airport again decides to adopt a specific policy regarding the rental of space to religious organizations, it will not be possible for a court to determine whether the Airport actually desires to ban rentals to such organizations, and, if so, whether a constitutionally valid reason for doing so exists. In the meantime, the prior policy of treating religious organizations like all others must remain in effect.

### V. POST–JUDGMENT ORDERS

The Airport argues that, because it had previously filed a notice of appeal, there

---

school, college, university, hospital, or other institution controlled by any religious creed, church or sectarian denomination whatever; nor shall any grant or donation of personal property or real estate ever be made by the state, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever.

was no jurisdiction in the district court to enter the orders of July 2, 23, and 30, 1984 and September 11, 1984.

The order of July 2, which directed a stay of the state court litigation, was vacated on September 11. The Airport is therefore, not aggrieved by the order of July 2, and under elementary rules of appellate procedure has no standing to appeal from that order. *See, e.g., Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 333, 100 S.Ct. 1166, 1171, 63 L.Ed.2d 427 (1980).

The orders of July 2 and 23 directing the parties to cooperate and negotiate, and the Airport to show all available rental space, have been fully complied with, and it is clearly impossible to undo the effects of that compliance. The appeal from those orders is therefore moot and cannot now be decided by this court. *See Honig v. Students of the California School for the Blind,* —— U.S. ——, 105 S.Ct. 1820, 85 L.Ed.2d 114 (1985) (per curiam); *University of Texas v. Camenisch,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); *Western Addition Community Organization v. Alioto,* 514 F.2d 542 (9th Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); 13A C.A. Wright, A.R. Miller, & E.H. Cooper, *Federal Practice & Procedure* § 3533.2 (2d ed. 1984).

We are left then, with the oral order of July 30 and the written order of September 11, both of which approved the settlement between the parties and, pursuant to the settlement, directed the Airport to issue a rental permit to the Reading Room. The normal rule is that a party cannot appeal from an order which it consented to have entered against it. *See, e.g.,* 15 C.A. Wright, A.R. Miller, & E.H. Cooper, *Federal Practice & Procedure* § 3902 at 408 (1976 & Supp.1985); 9 *Moore's Federal Practice* § 203.06 at 3–27 (1985). There is an exception to this rule, however, when it is clear that a party intended to preserve its right of appeal. *See, e.g., Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.,* 414 F.2d 750, 752 (9th Cir. 1969); 15 Wright, Miller & Cooper, *supra,* § 3902 at n. 26 (Supp.1985). On the record of this case it is clear that the Airport intended to preserve its right to appeal.

Rule 62(c) of the Federal Rules of Civil Procedure provides that "[w]hen an appeal is taken from [a] ... final judgment granting ... an injunction, the court in its discretion may suspend, modify, restore or grant an injunction during the pendency of the appeal." This rule codifies the inherent power of a court "to preserve the status quo where, in its sound discretion, the court deems the circumstances so justify," and specifically authorizes the district court to modify, if necessary, the terms of the injunction being appealed from. *McClatchy Newspaper v. Central Valley Typographical Union No. 46,* 686 F.2d 731, 734–35 (9th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982) (quoting 7 *Moore's Federal Practice* § 62.05 at 62–19). In light of the progress of the renovation work which necessitated the Reading Room's vacation of the space it then occupied, and the difficulty the parties were having in locating new but comparable space for the Reading Room, we cannot say that the district court abused its discretion by directing the issuance of a rental permit for substitute space in order to preserve the status quo and ensure the efficacy of the eventual decision of the court.

## CONCLUSION

We hold that the Airport's new policy of refusing to rent to a particular class of tenants, religious organizations, does not rationally further the purpose for which it was adopted, and thus violates the Equal Protection Clause. We also hold that the district court did not abuse its discretion in entering the post-judgment orders. Accordingly, we affirm the judgment and orders of the district court.

AFFIRMED.